**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James HILLSMAN, a/k/a Sampson, Winfred Owens, a/k/a Winfrey Owens, and Jaime Quezada, Defendants–Appellants.**

Nos. 96–1095, 96–2660, 96–3346.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1998.

Decided April 13, 1998.

Jon E. DeGuilio, Andrew B. Baker, Jr., Daniel L. Bella (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee in No. 96–1095.

Andrew B. Baker, Jr., Daniel L. Bella (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee in Nos. 96–2660 and 96–3346.

MacArthur Drake (argued), Drake & Associates, Gary, IN, for James Hillsman.

I. Alexander Woloshansky (argued), Merrillville, IN, for Winfred Owens.

Jerry B. Kurz (argued), Kathryn Hall, Hall & Kurz, Chicago, IL, for Jaime Quezada.

Before FLAUM, RIPPLE, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

The three appellants in this consolidated appeal pleaded or were found guilty of assorted criminal charges relating to their involvement in a large-scale drug conspiracy. They now appeal the sentences imposed by the district court. Appellant Hillsman contends that the district court improperly calculated his base offense level and criminal history category; in a related argument, he contends that the district court should have exercised its discretion to depart downward based on an unrepresentative criminal history. Appellants Owens and Quezada both argue that the district court incorrectly determined their "relevant conduct" for sentencing purposes—specifically, the quantity of drugs attributed to them. We affirm the district court in all respects.

## I. James Hillsman

James Hillsman pleaded guilty to one count of violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms; his guilty plea acknowledged the date of his offense as May 25, 1994.[1] As the charge indicates, this was not Hillsman's first brush with the law. He assaulted a federal officer and was sentenced to nine years imprisonment on January 17, 1975. In addition, he engaged in a conspiracy to distribute narcotics for which he was sentenced to fourteen years in prison on April 25, 1975. Hillsman served both of these sentences consecutively. The district court in this case sentenced Hillsman to fifty months imprisonment based upon the Guideline levels dictated by his prior crimes.

Hillsman challenges the district court's calculation of his sentence on two grounds. First, he argues that the district court improperly considered the first of his two prior convictions in setting his criminal history category and base offense level. The district court considered both of Hillsman's prior convictions in computing his criminal history category at III and his initial base offense level at 24. In doing so, the court relied upon USSG § 4A1.2(e), which establishes the conditions for considering prior

---

**1.** In exchange for this plea, the Government dismissed a charge of conspiracy to distribute a controlled substance.

convictions in determining a defendant's criminal history category:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen year period.

Based on this provision, and in light of the date of the instant offense, the district court in this case could only consider prior convictions for which Hillsman served prison time after May 25, 1979. Hillsman contends that he was paroled on the assault conviction more than fifteen years prior to committing the instant offense and that, therefore, the district court could not consider the assault as a prior conviction for sentencing purposes. Whether Hillsman was paroled on his assault conviction in 1979 is a factual determination that will not be disturbed unless clearly erroneous. *See United States v. Ramunno,* 133 F.3d 476, 480 (7th Cir.1998).

Hillsman argues that, according to the terms of § 4A1.2(e), the district court should not have considered his assault conviction and instead should have assigned him criminal history category of level II and a starting base offense level of 20.[2] He admits that he never received a formal grant of parole before 1979 because he served his assault and narcotics convictions consecutively. Nevertheless, he argues that setting his parole date on the assault conviction before 1979 is the only way to make his two consecutive sentences accord with the Government's prevailing parole policy at the time.[3] Hillsman received parole on April 27, 1982, after serving one-third of his court-imposed twenty-three-year sentence.[4] He argues that, because he received parole after serving one-third of his total sentence, he must necessarily be deemed to have received parole on each consecutive conviction after serving one-third of each sentence; otherwise, it would be mathematically impossible for him to have served a full one-third sentence on each conviction.

The Government suggests that Hillsman essentially received a lucky break by not having to serve the full one-third of his drug sentence. The Government, in essence, argues that Hillsman served some fraction greater than one-third of his nine-year sentence for assault and some fraction less than one-third of his fourteen-year sentence for his drug conviction. No explanation is given for Hillsman's early parole on the drug conviction; the Government instead provides evidence that Hillsman was not paroled early on the assault charge and, assuming that we will agree with it on this point, leaves us to speculate about the reasons for Hillsman's 1982 parole. The United States Parole Commission denied Hillsman's request for parole on the assault conviction on March 19, 1980— a date within the fifteen-year window of consideration for purposes of the Sentencing Guidelines. The denial states:

> Your offense behavior has been rated as Greatest II severity because of [a] shoot out with officers resulting in death of an individual and in addition you were also involved in a large scale conspiracy to dis-

---

**2.** In determining Hillsman's base offense level for his violation of 18 U.S.C. § 922(g)(1), the district court looked to USSG § 2K2.1(a)(2), which sets the level at "24, if the defendant had at least two prior felony convictions of either a crime of violence or a controlled substance offense". The district court reduced his base offense level to 21 based on his acceptance of responsibility. *See* USSG § 3E1.1. Hillsman contends that, according to USSG § 4A1.2(e), he had only one prior conviction within the applicable fifteen-year period prior to the instant offense. Therefore, he claims, the district court should have followed USSG § 2K2.1(a)(4)(A), which mandates a starting base offense level of "20, if the defendant had one prior felony conviction of either a crime of violence or a controlled substance offense". Taken together with the three-point acceptance of responsibility reduction, Hillsman argues that his ultimate base offense level should have been 17.

**3.** Prior to 1984, federal prisoners had to serve at least one-third of their court-ordered sentences before becoming eligible for parole. *See* 18 U.S.C. § 4205, *repealed,* Pub.L. No. 98–473, 98 Stat. 2027 (1984).

**4.** Based on time served before he received his assault sentence, Hillsman's parole date on April 27, 1982 reflects service of ninety-two months in prison-that is, one-third of his full twenty-three-year sentence on both charges.

tribute heroin and cocaine. You have a salient factor score of 7. You have been in custody a total of 65 months. Guidelines established by the Commission for adult cases which consider the above factors indicate a range of [64–92] months to be served before release for cases with good institutional program performance and adjustment. After review of all relevant factors and information presented, a decision above the guideline minimum is mandated in that your parole eligibility date exceeds the guideline minimum.

This denial shows that, as of March 1980, Hillsman was not paroled on the assault conviction. To the contrary, the Commission stated that his sixty-five months of service up to that point were not sufficient to justify parole on that charge in light of the seriousness of his offense.

Even though we affirm the district court's sentencing determination here, we do so without full satisfaction regarding the Government's handling of Hillsman's parole. There is firm support for the proposition that Hillsman was not eligible for parole on the assault charge until he served something above the minimum of the range of 64–92 months (he served his sixty-fourth month in February 1980); even if he was somehow paroled after serving only the minimum of that prescribed range, he would not have been eligible for parole on the drug conviction before October 1984. Something obviously was miscalculated here, though, because Hillsman was paroled on the drug conviction in April 1982. Hillsman, however, can only reap the benefit of the Government's error once. We conclude that the district court did not clearly err in sentencing Hillsman in this case based on a determination that he was serving time on his assault conviction after May 25, 1979.

■ Hillsman's second claim can be dismissed in short order. He contends that the court should have exercised its discretion to depart downward under USSG § 4A1.3 because his criminal history category significantly overstated his likelihood to commit further crimes. Hillsman presented testimony at his sentencing hearing in an attempt to demonstrate that his possession of a gun was inadvertent; this evidence, however, did not convince the district court to exercise its discretion to impose a sentence below the range prescribed by the Sentencing Guidelines. This is the end of the matter for purposes of our appellate review. We cannot review a district court's discretionary refusal to depart from the sentencing range recommended by the Guidelines unless that refusal was based on the court's erroneous belief that it had no power to make the requested departure. *See, e.g., United States v. Jarrett*, 133 F.3d 519, 535 (7th Cir.1998); *United States v. Poff,* 926 F.2d 588, 590 (7th Cir.) (en banc), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). Here, by contrast, the record indicates that the district court considered the evidence supporting Hillsman's request for a departure but decided that the departure was not warranted in this case.

We therefore affirm Hillsman's sentence.

## II. Winfred Owens

■ Winfred Owens took his case to a jury, which convicted him of three counts of distributing a controlled substance in violation of 21 U.S.C. § 841. He does not appeal those convictions. Rather, he objects to the sixty-three month prison sentence imposed by the district court. In reaching this determination, the court considered as "relevant conduct" not only the quantity of cocaine that the Government actually purchased from Owens (279.5 grams), but also two quantities (totaling fifteen ounces, or 425.25 grams) that Owens claimed to possess in recorded phone conversations. He argues on appeal that the district court violated his Fifth and Sixth Amendment rights by attributing the claimed—but unseized—fifteen ounces to him as relevant conduct.[5] We conclude that this claim has no merit.

The major source of evidence against Owens was one of his former customers, Rob

---

5. In this "relevant conduct" determination, courts must consider "all acts or omissions, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." USSG § 1B1.3(a)(1)(A).

Taylor, who agreed to cooperate with law enforcement officials in order to avoid prosecution on drug charges. Taylor, along with an undercover police officer, purchased 27.8 grams of cocaine from Owens on November 13, 1992. Taylor made two more supervised cocaine purchases from Owens in 1993—126.1 grams on March 3 and 125.6 grams on December 2. Taylor recorded the March 3 transaction with a hidden body wire. In that meeting, Owens told Taylor that he had to leave momentarily to retrieve more cocaine because he had sold "the whole nine" to someone earlier in the day. Taylor testified that, from his past dealings with Owens, he knew that "the whole nine" referred to nine ounces of cocaine (255.15 grams). Similarly, in a recorded telephone conversation on February 9, Taylor attempted to get Owens to sell him cocaine; in the course of their negotiation, Owens told Taylor that he had already sold drugs that day to someone in Taylor's housing project, but that Owens still had "five or six" in his possession. Taylor confirmed in that conversation that Owens meant "five or six o's", which, at Owens's sentencing hearing, Taylor translated to mean five or six ounces of cocaine (141.75–170.1 grams). Based on this evidence, the district court attributed to Owens the 279.5 grams of cocaine that the Government purchased from him, as well as the nine ounces (255.15 grams) referenced in the March 3 transaction and the six ounces (170.1 grams) to which Owens alluded in the February 9 recorded conversation.

■■■ Owens unpersuasively argues that the Government violated his constitutional rights by increasing his sentence based on allegedly unreliable evidence that was not subject to the full panoply of trial protections (including, he seems to argue, proof of the alleged acts beyond a reasonable doubt). We have repeatedly upheld the constitutionality of the Sentencing Guidelines' instruction to increase a defendant's sentence based on uncharged relevant conduct. *See United States v. Robinzine,* 80 F.3d 246, 253 (7th Cir.1996); *United States v. Corbin,* 998 F.2d 1377, 1384 (7th Cir.1993), *cert. denied,* 510 U.S. 1139, 114 S.Ct. 1124, 127 L.Ed.2d 432 (1994); *United States v. Mason,* 974 F.2d 897, 899–900 (7th Cir.1992); *United States v. Ebbole,*

917 F.2d 1495, 1501 (7th Cir.1990). To be sure, there are limits on the evidence that courts may consider in determining a defendant's relevant conduct, but those restrictions are quite permissive and solicitous of admissibility. First, the Government needs to prove its allegations of relevant conduct by only a preponderance of the evidence. *See United States v. Walls,* 80 F.3d 238, 241 (7th Cir.1996). Second, the Guidelines authorize courts to "consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). Finally, once the court has considered certain evidence, we will only reverse an assessment of relevant conduct if the disputed evidence is so unreliable or otherwise flawed that we are convinced "to a certainty that the district court's factual findings were incorrect"—*i.e.,* clearly erroneous. *United States v. Ramunno,* 133 F.3d 476, 480 (7th Cir.1998).

Owens's claim falls well short of this high mark. The district court listened to Owens describe his drug holdings in two recorded conversations. The court also listened to Rob Taylor describe his participation in these conversations, identify Owens's voice, and explain the meaning of their conversations with regard to the quantities of cocaine being discussed. Furthermore, the evidence shows that possessing the disputed fifteen ounces was sufficiently similar in time and type to Owens's charged conduct as to be "part either of the same course of conduct as the charged offense or of a common scheme or plan including the charged offense." *United States v. Crockett,* 82 F.3d 722, 730 (7th Cir.1996). In this case, the recorded conversations occurred on or around the same day as the charged cocaine purchases from Owens by Taylor. The conversations reveal that Owens sold the disputed fifteen ounces to other customers in the same housing project in which he sold the cocaine that led to the instant criminal charges. The amounts of cocaine discussed in the tapes were generally consistent with the amounts actually sold by Owens to Taylor—all were portions of a full kilogram between 125 and

250 grams—and the higher quantity does not appear to be merely "puffery," as Owens suggests. The disparity in quantities is not so great, and the evidence is not so unreliable, to warrant a conclusion that the district court clearly erred in finding that Owens possessed as much as 250 grams of unseized cocaine as part of his sales operation. For these reasons, we reject Owens's challenges to the district court's determination of his relevant conduct.

### III. Jaime Quezada

In 1990, Jaime Quezada began working as a dishwasher in a restaurant owned by Juan Miguel Herrera. In October 1993, Quezada's duties expanded to delivering cocaine to various customers on Herrera's behalf. Two of these customers were major players in the instant drug trafficking operation: Michael Jones and Frank Gonzalez, who sometimes supplied cocaine to Jones. The Government secretly recorded ten calls in February and March 1994 in which Quezada discussed the price of cocaine directly with Jones, who had agreed to cooperate with the Government by that time. Quezada continued to act as the middleman between Herrera and Gonzalez and Jones in the charged cocaine conspiracy until his arrest in May 1994; Jones and Gonzalez estimated that Quezada personally supplied them with approximately 80 kilograms of cocaine on Herrera's behalf. On the day of Quezada's arrest, police officers seized a ledger from his house; the Government contended that the ledger recorded cocaine customers, quantities sold to each customer (approximately 330 total kilograms),[6] the price per kilogram, and the amount of money owed by each customer to Herrera.

Quezada pleaded guilty to one count of conspiracy to distribute and to possess with

intent to distribute over 500 kilograms of cocaine in violation of 21 U.S.C. § 846. At this point, the battle shifted to the quantity of cocaine for which Quezada could be held accountable. This inquiry is mandated by USSG § 1B1.3(a)(1)(A) & (B), which states that courts must consider the following acts when determining a defendant's relevant conduct:

(A) [A]ll acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. . . .

The Government was required to prove Quezada's relevant conduct by a preponderance of the evidence. *See United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir.1998). The highest base offense level prescribed by the Sentencing Guidelines for relevant conduct in cocaine offenses is 38, and any quantity over 150 kilograms of cocaine qualifies a defendant for this rating. *See* USSG § 2D1.1(c). The district court found that the ledger, taken together with first-hand witness testimony of Quezada's cocaine deliveries, provided reliable indication that Quezada's relevant conduct was over 150 kilograms (and, thus, that his base offense level was 38).[7] The court

---

**6.** For some unexplained reason, the Government mistakenly represented to the court that the ledger reflected a distribution of only 179 kilograms of cocaine rather than the full 330 kilograms. The Government admitted that the 179 kilogram figure was an error, but it did not correct this error at the sentencing hearing because any amount of cocaine over 150 kilograms qualified Quezada for the highest possible base offense level of 38. *See* USSG § 2D1.1(c).

**7.** This testimony and evidence might have been entirely academic. Quezada admitted in his plea agreement that the conspiracy distributed at least 500 kilograms of cocaine:

In regard of my plea of GUILTY to Count 4 of the indictment, I acknowledge and admit that beginning from in or about July, 1993, to in or about May, 1994, I did knowingly combine, conspire, confederate and agree with Michael Jones and others to knowingly and intentionally possess with intent to distribute and to dis-

sentenced Quezada to 168 months imprisonment followed by five years of supervised release.

■ Quezada argues on appeal that the district court improperly considered the ledger in determining his relevant conduct. Instead, he states, the court should have based its relevant conduct only on the drugs that he personally delivered to Jones and Gonzalez. He points out that the ledger never mentions the word "cocaine" and that it does not contain a series of dates tying the alleged transactions to the charged conspiracy. Furthermore, the ledger lists customers by first- or code-names only, which Quezada argues should have precluded the district court from connecting the ledger to the activities of the charged conspiracy.

Quezada's arguments do not persuade us that the district court's factual finding is clearly erroneous. *See United States v. Acosta*, 85 F.3d 275, 279 (7th Cir.1996). Quezada admitted to making cocaine deliveries on Herrera's behalf; significantly, he also admitted that he made notations in the ledger at Herrera's request and that, *"at least initially*, he did not know what the figures meant" (emphasis added). Barbara Magrames, an intelligence analyst for the Drug Enforcement Agency, decoded the ledger as recording information such as the kilograms of cocaine delivered to a customer, the price of the transaction, and the payments owed on that transaction. The charged conspiracy operated from July 1993 to May 1994, and the only date listed in the ledger was April 11, 1994—a date during this period. Quezada was a dishwasher and cook in Herrera's restaurant, and common sense begs the question: if not for cocaine sales, why else would he have a detailed ledger of transactions? There was never any inference that Quezada participated in the management of the res-

taurant or that he had any other reason to keep a ledger. Thus, the district court did not clearly err by finding the ledger to be a reliable proof of cocaine transactions in which Quezada was involved.

■ Moreover, the district court did not clearly err in concluding by a preponderance of the evidence that the recorded transactions were part of the charged conspiracy. It may well be true that some of the customers in the ledger were not conspirators in the instant indictment; the coded entries prevented the district court from knowing one way or the other. Nevertheless, USSG § 1B1.3 mandates in such a case that a conspirator's relevant conduct includes "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." USSG 1B1.3, comment. (n.2). The customers to whom Quezada sold cocaine are largely irrelevant, therefore, because Quezada admits that Herrera supplied all of the contraband reflected in the ledger; Quezada committed his criminal actions in this case at the explicit direction of Herrera, and the district court did not clearly err in finding that the drug quantities reflected in the ledger were within the scope of the criminal activity that Quezada undertook along with Herrera.

We therefore conclude that the district court's factual finding that the cocaine transactions recorded in the ledger constituted part of Quezada's relevant conduct was not clearly erroneous.

## IV. Conclusion

We affirm the district court's sentences for all three appellants in this case.

---

tribute in excess of 500 kilograms of cocaine, a scheduled [*sic*] II controlled substance; in violation of Title 21, United States Code, Section 846.

Quezada repeated this admission no less than seven times during his plea colloquy. In conspiracy cases, however, a sentencing judge must determine relevant conduct through an individualized determination of the extent of the full conspiracy's activity that was reasonably foreseeable to the defendant. *See* USSG § 1B1.3, com-

ment. (n.2); *United States v. Edwards*, 115 F.3d 1322, 1327–28 (7th Cir.1997). The Government did not urge, and the district court did not undertake, an inquiry into how much of this 500 kilograms was reasonably foreseeable to Quezada. If Quezada had been aware of the full scope of the conspiracy's operations, then an inquiry along this line might have shown that all 500 kilograms (or some portion above 150 kilograms) were reasonably foreseeable to him, thus rendering unnecessary the dispute over the ledger.