UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert D. HUNTER, Defendant–
Appellant.

No. 97–3717.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1998.

Decided May 28, 1998.

Thomas A. Keith (argued), Office of the United States Attorney, Peoria, IL, for Plaintiff–Appellee.

Joseph P. Chamley (argued), Evans, Froehlich & Beth, Champaign, IL, for Defendant–Appellant.

Before FLAUM, RIPPLE, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Robert Hunter of conspiracy to manufacture and distribute crack cocaine, in violation of 21 U.S.C. § 846, and possession of powder cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a). The district court sentenced Hunter to 240 months imprisonment on each count and ordered that the punishments run concurrently. On appeal, Hunter challenges the sufficiency of the evidence of his guilt on both counts. He also argues that the district court abused its discretion by admitting evidence of his attempted flight from police officers immediately preceding his capture. Finally, he contests the sentence imposed by the district court. We affirm.

I.

Phillip Washington and Donte Johnson began smuggling powder cocaine from Los Angeles to Champaign, Illinois, as early as 1995. In late 1996, Washington became more ambitious and started converting the powder to

crack cocaine in Champaign at the home of Kathryn Ann Hunter. Mrs. Hunter's live-in boyfriend, Marvin Terrell, served as the street dealer for the crack cocaine produced by Washington. Robert Hunter, the defendant, is Kathryn Ann Hunter's son.

Washington made one of his numerous smuggling trips to Champaign in January 1997. Before he could return to Los Angeles, he received word from Johnson to remain in Champaign. Johnson eventually met Washington at Kathryn Ann Hunter's home on January 11, and Marvin Terrell took the two men to a local motel. They checked into room 120 and discussed the status of their criminal operation. In this meeting, Johnson informed Washington that a large shipment of their powder cocaine was held up in St. Louis. Washington agreed to retrieve the cocaine and transport it back to Champaign.

During this meeting, Washington discussed Robert Hunter's role in the operation with Johnson. Johnson said that he had brought Hunter with him from Los Angeles because Hunter's mother lived in Champaign and so that Hunter could "watch his back." At trial, Washington explained that Hunter accompanied Johnson because "if anything happens, if anybody was to try to jack him [Johnson] or anything, then Robert would be there for him." Washington confirmed that Hunter was brought to Champaign, at least in part, to serve as Johnson's "muscle".

The next morning, on January 12, Champaign police officers set up a rudimentary surveillance system in room 118 in the motel—the room adjoining Washington and Johnson's room. Officers sat on the bed in room 118 and placed an ear to the wall to eavesdrop on the activities in room 120. Washington and Johnson stayed in room 120 for most of the day, and Robert Hunter joined them around 4:00 p.m. Terrell drove Washington to the bus depot at approximately 5:30 p.m., while Hunter and Johnson remained in room 120.

Phillip Washington returned from St. Louis on the next night, January 13, with thirteen ounces of powder cocaine in his possession. He went immediately from the bus depot to the motel and called Kathryn Ann Hunter's apartment. Washington instructed Mrs. Hunter to inform the defendant and Donte Johnson that he was back in Champaign. Officers overheard this conversation through the wall and noted that Washington said that he was "needing to get paid" after "bringing it in".

Hunter was the first to arrive at the hotel to meet Washington. He carried a brown paper bag with him. Before anyone else arrived, according to Washington's trial testimony, the two men discussed their plans to convert the powder cocaine into crack and to use the proceeds of those sales as a stepping stone to more ambitious criminal undertakings. Washington testified:

> So I was like telling him how we can just—we can go take whatever we make out of this, we go to California. And so like if [the defendant] get $3,000, Donte get $3,000, we put all our money together, we can then buy a big amount of drugs in L.A. and come back here and make way more money than we would in L.A.

Indeed, a police officer in room 118 overheard these lengthy discussions and stated at trial:

> It was both Robert Hunter and Phillip Washington.... They were talking back and forth between one another making reference to, "Let's pool everything together, we'll just get a bird." When I heard the term "bird," I immediately related it to meaning one kilogram of cocaine [1] .... One would say, "Why don't we pool everything together and get a bird?" And the other one in agreement say, "Yeah, we'll take everything we've got and we'll get a bird with it."

At the end of this discussion, Washington testified that Hunter said, "Well, let's go and rock this up now, because I need a little pocket change. I'm running low on money."

Soon after these discussions, Marvin Terrell arrived at the motel to pick up Hunter and Washington. From room 118, the police overheard the men manipulating a paper bag and Terrell, apparently, say "Lordy, Lordy." Terrell carried the brown paper bag formerly

---

1. Phillip Washington confirmed at trial that the      term "bird" referred to one kilogram of cocaine.

in Hunter's possession to his car, and Hunter and Washington also got inside Terrell's car. The three men set out for Kathryn Ann Hunter's apartment, but they made a brief stop at a convenience store to purchase baking powder for converting the powder cocaine into crack. Champaign police officers had been following the car since it left the motel, and they stopped the car soon after the men drove away from the convenience store. As officers approached the car on foot, Terrell sped away from the scene and led the police on a high-speed chase. The car stopped in an alley behind Kathryn Ann Hunter's apartment, and the men leaped out of the car and began to run away from the pursuing police officers. Hunter ran about fifteen to twenty feet before he was apprehended. Terrell was captured after a brief flight, as well, but Washington got further on foot. While running, Washington discarded his leather jacket, inside which police later discovered a brown paper bag containing 328 grams of powder cocaine wrapped in thirty-three individual bags; police seized the baking powder from him after he was captured.

In a superseding indictment, the Government charged Hunter with one count each of conspiracy to manufacture and distribute crack and possession of cocaine with intent to distribute. Phillip Washington and Marvin Terrell agreed to cooperate with the Government, and they testified against Hunter at trial. After a three-day trial, the jury convicted Hunter of both charged offenses. The district court imposed two concurrent terms of 240 months imprisonment, as well as terms of ten and six years of supervised release also to run concurrently. On appeal, Hunter challenges the sufficiency of the evidence of his guilt on both counts, the district court's decision to allow introduction of evidence of his flight from the police, and the calculation of his sentence.

## II.

### A. Sufficiency Challenges

■ Hunter contends that the Government did not offer sufficient proof of his guilt on either charged offense. We review the evidence in the light most favorable to the Government and will uphold the convictions if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Granados*, 142 F.3d 1016 (7th Cir.1998). Hunter cannot carry this onerous burden for either count of conviction. First, to support a conviction on the conspiracy charge, the record must contain evidence from which the jury could conclude that a conspiracy to distribute crack cocaine existed and that Hunter knowingly participated in it. *See United States v. Taylor*, 116 F.3d 269, 271 (7th Cir.1997). The proof of these elements may come from either direct or circumstantial evidence. *See United States v. Hightower*, 96 F.3d 211, 214 (7th Cir.1996). For purposes of this charge, it makes no difference whether Hunter was personally engaged in the sale or manufacture of crack cocaine; there need only be substantial evidence that he knew that his coconspirators engaged (or would engage) in these activities and that he played a role that furthered the common goals of the conspiracy. *See id.*

■ The Government presented substantial evidence of Hunter's participation in the charged conspiracy that could have been credited by a rational trier of fact. The jury heard Phillip Washington testify that Hunter accompanied Donte Johnson to Champaign for the purpose of guarding Johnson and his drug proceeds. Moreover, Washington detailed the conversation in which Hunter approved a plan to convert powder cocaine into crack, sell the crack in Champaign, and then pool his share of the profits from these sales with the profits of Washington, Terrell, and Johnson. Hunter saw the pooling arrangement as a means to purchase a kilogram of cocaine in Los Angeles and repeat the whole process on an even larger scale. Hunter's only answer to this evidence is to impugn the credibility of Washington, but such evaluations are the province of the jury. We cannot question the jury's credibility determinations except in the rare case in which it was "physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *Unit-*

*ed States v. Saulter,* 60 F.3d 270, 275 (7th Cir.1995) (quoting *United States v. Van Wyhe,* 965 F.2d 528, 531 (7th Cir.1992)). Far from approaching this line, Washington's testimony was corroborated by a Champaign police officer who was eavesdropping from the adjacent room. This direct evidence is enough to defeat Hunter's first sufficiency challenge.

His second sufficiency claim fares no better. Hunter challenges the sufficiency of the evidence on his conviction for possession of powder cocaine with intent to distribute. As before, his argument rests almost solely on an assertion that the key witness against him, Phillip Washington, was not credible as a matter of law because he made a deal with the Government. To establish a violation of 21 U.S.C. § 841(a)(1), the Government must prove beyond a reasonable doubt that Hunter (1) knowingly or intentionally possessed powder cocaine, (2) possessed the cocaine with the intent to distribute it, and (3) knew the cocaine was a controlled substance. *See United States v. Magana,* 118 F.3d 1173, 1199 (7th Cir.1997). Possession need not be actual or exclusive; we have held that the Government satisfies its burden on this point if it establishes joint or constructive possession.[2] *See United States v. Tirrell,* 120 F.3d 670, 675–76 (7th Cir.1997).

In this case, a rational jury could have concluded that Hunter knew of the cocaine in Washington's possession and constructively possessed it. Hunter protected Donte Johnson, his co-conspirator, on the trip from Los Angeles to Champaign. Once Phillip Washington returned to Champaign from St. Louis, Hunter was the first of the conspirators to meet him at the motel. Hunter carried a brown paper bag into the room; officers overheard the conspirators manipulating the bag and, later, saw Terrell carry the bag to the car with Hunter and Washington. The cocaine seized from Wash-

ington was contained in this brown paper bag, which the men were attempting to transport to Kathryn Ann Hunter's apartment. *See, e.g., United States v. Hernandez,* 13 F.3d 248, 252 (7th Cir.1994) (affirming jury's finding of constructive possession of cocaine because the appellant knew of the contraband in his co-conspirator's possession, assisted in transporting it, and had the capability to exercise control over it); *United States v. Salazar,* 983 F.2d 778, 782 (7th Cir.1993) (affirming jury's finding of constructive possession because the appellant helped to arrange a cocaine sale, knew the cocaine was hidden in the car in which he was riding, and intended to complete the sale with his co-conspirators). Further, the jury heard evidence of Hunter's enthusiasm to convert the powder into crack quickly, to sell it in Champaign, and then to pool his share of the profits of that sale to purchase even more powder cocaine in Los Angeles. It is entirely rational that a jury would conclude that Hunter, as a co-conspirator, had a possessory right to the powder cocaine in Washington's possession, and that Hunter and his co-conspirators planned to sell the cocaine in the area.

We therefore reject both of Hunter's sufficiency challenges.

**B.  *Evidence of Flight***

Hunter and his co-defendants attempted to avoid capture by the Champaign Police Department. The Government attempted to introduce this evidence of flight as proof of Hunter's consciousness of guilt. The district court, however, carefully balanced the probative and prejudicial effects of the testimony and determined that only evidence of Hunter's flight on foot satisfied the standard of Federal Rule of Evidence 403;[3] the court excluded evidence of the car chase, on the other hand, because its prejudicial effect outweighed its slight probative value. On ap-

---

2.  Constructive possession exists when a person does not have actual possession of contraband but instead was able and intended to exert control over it at a particular time. The person may exercise this control either directly or through others. See *United States v. Kitchen,* 57 F.3d 516, 520–21 (7th Cir.1995).

3.  Federal Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

peal, Hunter argues that even this compromise measure irreparably tainted his trial with unfairness.

We are not persuaded that the evidence of flight unfairly prejudiced Hunter; moreover, we do not believe that the district court erred in the first place. We review the district court's refusal to exclude evidence pursuant to Rule 403, like other evidentiary rulings, for an abuse of discretion. *See United States v. Williams*, 106 F.3d 1362, 1366 (7th Cir.1997); *United States v. Long*, 86 F.3d 81, 83 (7th Cir.1996). Evidence of a defendant's flight can be probative of the defendant's consciousness of his guilt. *See, e.g., United States v. Smith*, 34 F.3d 514, 521 (7th Cir.1994). This principle rests on a belief that a defendant would not have run from the police unless he knew he had done something wrong (and, thus, something to fear from capture by the police). This view, however, can be too simplistic in many cases, and we have cautioned district courts to exercise caution in admitting evidence of a defendant's flight. *United States v. Williams*, 33 F.3d 876, 879 (7th Cir.1994).

In this case, the district court carefully evaluated the probative and prejudicial effects of admitting evidence of Hunter's flight. Judge McDade concluded that Hunter's participation in the car chase—in which Marvin Terrell drove the car—did not sufficiently evince *Hunter's* consciousness of guilt. On the other hand, Hunter's decision to run from the police on foot was probative of his consciousness of guilt; his foot flight, unlike the car chase, could not be attributed to the acts of another co-defendant. Moreover, Phillip Washington discarded his jacket full of cocaine during this foot chase. Testimony of the foot chase was therefore inextricably intertwined with the Champaign police officers' testimony regarding the seizure of the cocaine that formed the basis of the charged offenses and Hunter's sentence. Once evidence of Washington's flight came in, excluding evidence of Hunter's flight at the same time might have conveyed the inaccurate impression that Hunter did not also run from the police. Evidence of Hunter's flight, therefore, was necessary to tell the whole story of the defendants' capture and the cocaine found in their possession at that time. Under these facts, the probative value of the flight evidence outweighed any potential prejudice to Hunter.

Any doubts we might have about this conclusion are allayed by the harmlessness of the district court's alleged error. *See* FED.R.CRIM.P. 52(b). We have stated that "[a]n evidentiary error does not justify reversing a jury's verdict unless a reviewing court determines that the error had a substantial and injurious effect or influence on the jury's verdict." *United States v. Jarrett*, 133 F.3d 519, 529 (7th Cir.) (quotation omitted), *cert. denied*, —— U.S. ——, 118 S.Ct. 1688, 140 L.Ed.2d 824 (1998). Hunter's trial lasted for three days, and, during that time, the Government presented a great deal of testimony that established his guilt on both charged offenses. Hunter cannot realistically claim that the jury's decision to convict was meaningfully affected by admission of the disputed flight evidence. This evidence, rather, merely lent mild support and credibility to the Government's other, more substantial proof of Hunter's guilt. Thus, regardless of whether we accepted his claim of error, we would reject his challenge to the district court's admission of evidence of his flight.

## C. Sentence Calculation

Finally, Hunter claims that the district court miscalculated his sentence by relying on unreliable evidence. Specifically, he alleges that the district court improperly considered the testimony of Lieutenant John Murphy of the Champaign Police Department. Hunter contends that Murphy was not qualified to offer an opinion on the conversion ratios of powder cocaine to crack. The district court's reliance on Murphy's estimates, according to Hunter, led to an inflated determination of the amount of crack that the conspirators agreed to "cook" and distribute.

A district court's calculation of the quantity of drugs involved in an offense is a finding of fact reviewed for clear error. *See Jarrett*, 133 F.3d at 530. This means that we will only remand this case for resen-

tencing if we are convinced "to a certainty that the district court's factual findings were incorrect". *United States v. Ramunno*, 133 F.3d 476, 480–81 (7th Cir.1998). We are not so convinced in this case. At the time of the sentencing hearing, Lieutenant Murphy had served as a police officer for eleven years, most of which he spent investigating cases of crack cocaine manufacturing and distribution. He conservatively estimated that he had investigated no less than three hundred crack cocaine cases, had debriefed no less than five hundred people involved in the crack cocaine business, and had executed search warrants on ten to twenty crack "cooking" houses. He not only interviewed countless people on the means and procedures for manufacturing crack, but he also participated in numerous narcotics-related investigation courses and viewed two training videos detailing the crack manufacturing process produced by the Broward County (Florida) Sheriff's Department. In response to Hunter's objection to Lieutenant Murphy's testimony, the district court acknowledged that Murphy lacked the experience of a chemist but thought that he could nevertheless offer valuable insights concerning the manufacture of crack from powder cocaine.

The district court conservatively calculated Hunter's sentence based in part on the estimated conversion ratios offered by Lieutenant Murphy. The expected loss in weight in the conversion process, according to Lieutenant Murphy, was approximately ten to fifteen percent. This figure varied with the skills of each particular "cook", but he testified that no one would continue to use a cook who lost as much as thirty percent of the original weight of a batch of powder cocaine. The district court also credited the testimony of John Martin, a forensic scientist, who stated that the powder cocaine seized from Washington's jacket was 78% pure. The court, accordingly, subtracted 22% of the gross powder weight for impurities and then another 30% from the gross weight in consideration of the "worst case scenario" described by Lieutenant Murphy. Thus, the district court deducted 52% of the gross powder weight to arrive at the figure of 157 grams of crack. This figure is an extremely conservative estimate that falls far short of the 228-gram figure recommended by the Presentence Investigation Report. Furthermore, although conversion ratios are a finding of fact that must be determined in each individual case, the 52% loss ratio in this case is much more forgiving to Hunter than the figure yielded by harsher ratios that we have approved in other cases. *See, e.g., United States v. Taylor*, 116 F.3d 269, 273 (7th Cir. 1997) (affirming a crack cocaine quantity determination based on a lost-weight ratio of only 12%).

The district court's conservative calculations, along with Lieutenant Murphy's experience in this field, persuade us that the 157–gram determination is not clearly erroneous. The Federal Rules of Evidence do not apply in sentencing hearings, *see United States v. Hillsman*, 141 F.3d 777 (7th Cir. 1998), and the district court was entitled to rely on Lieutenant Murphy's testimony even if it may not have qualified as expert testimony under Federal Rule of Evidence 702. The Guidelines (and the Due Process Clause) allow sentencing courts to rely on information that "has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). Lieutenant Murphy's extensive investigative experience with crack cocaine, as well as his training in the area, cloaked his testimony with the requisite indicia of reliability. The district court acknowledged that the Lieutenant was not a chemist and that his testimony would be discounted accordingly. Frankly, there is not much more Hunter could have asked from a sentencing court. The district court's avowedly-limited consideration of Lieutenant Murphy's testimony, along with the decision to apply such a conservative conversion ratio, convinces us that *the court did not clearly err in calculating Hunter's relevant conduct at 157 grams of crack.*

### III.

For the foregoing reasons, we affirm Hunter's convictions and sentence.