**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Philip FIORE, also known as Pete, and Louis J. Bombacino, also known as John Lordo, also known as Louie, Defendants–Appellants.**

Nos. 97–3338, 98–1829, 98–1830.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1998.

Decided May 25, 1999.

---

**920**

Terry M. Kinney (argued), Mitchell A. Mars, Office of the United States Attorney, Chicago, IL, for plaintiff-appellee.

Robert A. Stevenson (argued), Palos Park, IL, for defendant-appellant.

Before CUMMINGS,[*] BAUER, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

On August 2, 1995, a federal grand jury returned an eleven-count indictment charging nine defendants, all members of the Calabrese Crew (the "Crew"), with racketeering, extortion, mail fraud, and tax violations stemming from a criminal loan-sharking enterprise. Two of the defendants named in the indictment, Philip Fiore and Louis Bombacino, were charged with racketeering, conspiracy, and extortion, pursuant to 18 U.S.C. §§ 894, 1962(d), stemming from their involvement in the Crew's loan-sharking activities. In addition, both were subject to criminal forfeiture. The indictment also charged Bombacino with two counts of witness intimidation, in violation of 18 U.S.C.

\* Judge Cummings participated in this case through oral arguments; however, he died on April 24, 1999.

§ 1512(b)(3). Bombacino entered into a plea agreement. Fiore, on the other hand, proceeded to trial on the charges brought against him and was found guilty on all counts. We affirm.

## I. BACKGROUND

The Crew is one of many street gangs within Chicago's organized crime world. During the 1980's, the Crew engaged in a variety of illicit activities, such as extortion, street tax collection, gambling, and loan-sharking. The Crew's loan-sharking operation consisted of collecting many high interest loans, commonly known as "juice loans," with either an implicit or explicit understanding that failure to repay the juice loan could result in severe injury or death to the borrower or his family.

Philip Tolomeo was a member of the Crew from 1978 until November 1988. In 1988, Tolomeo fled Chicago after embezzling money from other members of the Crew; an act of incredible courage or incredible stupidity. When Tolomeo fled, he took with him comprehensive records detailing his juice loan collections on behalf of the Crew. Tolomeo's records included the names of individuals from whom he collected, the interest rates of the juice loans, and the amounts turned over to his superiors in the Crew. When Tolomeo entered the Witness Security Program, he provided these records to the FBI.

At Fiore's trial, Tolomeo identified all the members of the Crew. Tolomeo also testified as to the hierarchy of the Crew, the jobs performed by each member, and his extensive role as a juice loan collector. According to Tolomeo's testimony, in 1983, Frank Calabrese, the leader of the Crew at that time, introduced Tolomeo to Fiore and instructed him to train Fiore in the juice loan collection business. While working under Tolomeo, Fiore became skilled

in methods of debt collection, interest rate calculation, and bookkeeping.

Shortly after Tolomeo trained Fiore, Tolomeo fell out of favor with Frank Calabrese. As a result, Fiore was promoted and assumed Tolomeo's juice collection accounts. This promotion required Fiore to meet directly with Frank Calabrese to discuss juice loan activity. Meanwhile, Tolomeo, who now answered to Fiore, continued his collection activity but was closely scrutinized by Fiore and other members of the Crew. Soon thereafter, Tolomeo left the Crew and entered the Witness Security Program.

In the early 1980s, Bombacino, who had been working for another street crew at the time, approached Tolomeo and asked Tolomeo to relay his interest in working for the Crew to Frank Calabrese. Several years later, Bombacino met with Frank Calabrese and began collecting juice loans for the Crew. According to Tolomeo, Bombacino turned in the proceeds of his juice loan collections to Fiore.

Bombacino was a cavalier juice loan collector. He regularly carried a handgun and often displayed it while collecting juice loans. Bombacino frequently threatened juice loan debtors or their families with physical harm when the debtor was late on payments. Bombacino also used his organized crime connections to intimidate potential witnesses into silence. For example, Bombacino cautioned potential witnesses that the authorities could put him away, but they could never put the whole "outfit" away. Furthermore, when Bombacino learned that the FBI was investigating him for extortion, Bombacino advised his juice loan clientele to lie to federal agents in an attempt to derail the federal investigation. On one occasion, when an undercover agent attempted to arrest Bombacino, he led the agent and several local police officers on a high speed chase, racing across a local park where he tossed juice loan records, a hand gun, and an ankle holster from the window of his automobile; a chase that gives authenticity to some of Hollywood's favorite police chase scenes.

At Fiore's trial, several juice loan victims with whom Fiore and Bombacino did business testified as to their juice loan payments to both men. For example, Richard Bruno, a car salesman, testified to receiving a juice loan from Bombacino in the fall of 1990. Bruno borrowed $500 from Bombacino and paid weekly interest of $50. On one occasion, Bombacino directed Bruno to meet Fiore to make a payment on the loan. Bruno met Fiore who collected the payment for Bombacino. Bruno's name and telephone number were found in juice loan records recovered from a search of Bombacino's house and were also found in a green address book that police recovered from a search of Fiore's house. Throughout Fiore's trial, many juice loan debtors identified their names and phone numbers as names and numbers appearing in the green address book.

Frank Varchetto was another juice loan debtor who testified on behalf of the government. Varchetto testified that he received a juice loan from Bombacino. Varchetto further testified that on one occasion, Bombacino directed him to make a juice loan payment to Fiore. When Fiore came to accept the payment, Fiore cautioned Varchetto that he should lie to the FBI about Fiore's dealings with members of the Crew.

Fiore testified in his own defense at trial, claiming that Tolomeo forced him into becoming a juice loan collector for the Crew when he was unable to pay a juice loan that he had made with Tolomeo. In support of his coercion defense, Fiore claimed that Tolomeo showed him a gun once and he "sort of felt threatened." Fiore also claimed that on another occasion, Tolomeo stated that "things could happen" if Fiore did not repay him. Fiore further testified that Tolomeo left town, claiming that he would be gone for a couple of weeks, and asked that Fiore hold on to a green address book, several slips of

paper, and some blank promissory notes. According to Fiore, Tolomeo never returned so he held on to Tolomeo's property until it was acquired by the FBI during the search of his house.

On May 1, 1997, the jury found Fiore guilty on all counts. The jury also returned a forfeiture verdict of $2,600,000 against him. On September 3, 1997, the district court sentenced Fiore to 120 months on each count to run concurrently, followed by three years of supervised release on each count, also to run concurrently. Fiore was also assessed a $5,000 fine.

On April 8, 1997, Bombacino pleaded guilty to all counts of which he was charged in the indictment. On February 7, 1998, the government filed an additional one-count information charging Bombacino with mail fraud. Bombacino pleaded guilty to the mail fraud information.

On March 18, 1998, the court sentenced Bombacino on both the racketeering and the mail fraud charges. With respect to the racketeering charges, the court sentenced Bombacino to 120 months of imprisonment on each count to run concurrently and a three-year term of supervised release. With respect to the mail fraud information, the district court sentenced him to 24 months of incarceration, consecutive to the sentence imposed for the racketeering charges, a three-year period of supervised release, and ordered restitution in the amount of $2,328.

Fiore appeals both his conviction and sentence while Bombacino only appeals his sentence.

## II. DISCUSSION

### A. Fiore's Request for a Coercion Jury Instruction

 Fiore contends that the district court erred by denying his request for a jury instruction on coercion. A district court's decision that a defendant failed to present sufficient evidence to be entitled to a jury instruction on a particular defense theory is subject to *de novo* review. *United States v. Bastanipour,* 41 F.3d 1178, 1183 (7th Cir.1994). A defendant is entitled to an instruction on his theory of the case if: 1) the proffered instruction is a correct statement of the law; 2) the theory of defense is supported by the evidence; 3) the theory of defense is not part of the charge; and 4) the failure to include the instruction would deny the defendant a fair trial. *United States v. Wilson,* 134 F.3d 855, 865 (7th Cir.1998); *United States v. Boykins,* 9 F.3d 1278, 1285 (7th Cir.1993).

 Coercion, also known as duress, is available only if the defendant establishes three elements: 1) an immediate threat of death or serious bodily injury; 2) a reasonable fear that the threat will be carried out; and 3) no reasonable opportunity to avoid the threatened harm other than by committing the criminal act charged. *United States v. Sotelo,* 94 F.3d 1037, 1039 (7th Cir.1996). A defendant is entitled to an instruction of coercion only after he has produced sufficient evidence from which a rational jury could find all the elements of the defense. *Id.*

In the immediate case, the record does not support the elements of the coercion defense. As a matter of fact, Fiore's own testimony negates the existence of the first element—an *immediate* threat of death or serious bodily injury. For example, Fiore testified that, Tolomeo once showed him a gun and gestured "like ... he would do something," although Tolomeo did not point the weapon at Fiore. On another occasion, Tolomeo told Fiore that if Fiore did not collect the juice loans with him, "things could happen," although Fiore also testified that Tolomeo never explicitly detailed to Fiore what those "things" were and that Tolomeo was referring to "things" that would happen in the future. Evidently, Fiore's experience was enough so that Tolomeo's remark made him rather uneasy, at the least. In addition, the evidence demonstrates that Fiore's role in the collection activities in the Crew continued

even after Tolomeo fled in November of 1988. Fiore never discussed any specific threats of harm from any members of the Crew other than Tolomeo. Fiore's testimony, at best, refers to "things" that *might* happen in the future; these are not immediate threats of death or serious bodily injury. *See id.*

■ The record also shows that Fiore does not satisfy the third element of the coercion defense: that he was without reasonable opportunities to avoid the threatened harm other than by committing the criminal act charged. Fiore testified that he never went to authorities to advise them that Tolomeo had threatened him or that Tolomeo forced him to collect juice loans. Even after Fiore learned from FBI agents that Tolomeo was cooperating with the government, he did not inform them of Tolomeo's threats. Fiore obviously had reasonable opportunities to avoid the threatened harm but he failed to seize those opportunities. We agree with the district court that Fiore failed to present evidence to support a coercion defense.

■ Fiore next contends that he is entitled to a coercion instruction predicated upon the state law defense of compulsion, see 720 ILCS 5/7–11, because the indictment charged state criminal violations under RICO. Under Illinois law, a compulsion defense is available if there is "some foundation" in the evidence for such a defense. *People v. Swartz*, 186 Ill. App.3d 399, 134 Ill.Dec. 336, 542 N.E.2d 515, 517 (1989). Although the wording of the Illinois compulsion statute is somewhat different from the federal rules, suffice it to say that the statute, like the federal law, requires a finding of imminent infliction of death or great bodily harm. *See* ILCS 5/7–11. As we have already discussed, the record reveals no evidence of an imminent threat of death or great bodily injury. Thus, no state law compulsion instruction was warranted.

## B. Fiore's Obstruction of Justice Enhancement

■ Fiore next contends that the government erroneously imposed a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. Under § 3C1.1, a court will increase a defendant's offense level by two if the court finds that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution or sentencing of the instant offense." The commentary to § 3C1.1 provides a "non-exhaustive list" of examples of the types of conduct to which the obstruction enhancement applies. Among these examples of conduct is "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1, Application Note 4.

■ Here, the district court applied the two-level enhancement based on findings that Fiore perjured himself at trial by minimizing the role that he played in the Crew:

I believe that the testimony of Mr. Fiore in which he tried ... to weave a tale that he was victimized and joined this band of juice loan operators because ... another participant on one occasion showed Mr. Fiore a firearm and that that caused Mr. Fiore to feel coerced and intimidated to the point that he had joined this against his will[.][T]hat line of testimony by Mr. Fiore was false ... and it was false in that the evidence established ... that he was a knowing and willing participant in this. He even took on responsibilities ordered of him to supervise these other individuals whom he claimed ... to be afraid of.

. . . . .

He had the right to testify. He also had the right not to testify. He did not have the right to commit perjury. Therefore, a two point enhancement for obstruction of justice should be added.

Fiore Sentencing Trans. at 28–30. A district court's finding of perjury is based

primarily on the issue of credibility, and we give almost absolute deference to a court's credibility determinations because the court had the opportunity to hear the witness's testimony firsthand. *United States v. Mattison*, 153 F.3d 406, 412 (7th Cir.1998).

In this case, the district court expressly identified the precise testimony that it found to be false; a finding that Fiore does not contest on appeal. Rather, Fiore argues that enhancing his sentence penalizes him for presenting a coercion defense and thus has "a chilling effect on the administration of justice [such] that no Defendant would ever take the stand in his own defense." This Court has consistently rejected this argument. *See United States v. Emerson*, 128 F.3d 557, 563 (7th Cir. 1997) (holding that " § 3C1.1 is not intended to punish a defendant for exercising his right to testify, but the guideline does punish those who commit perjury when denying their guilt"). The right to testify does not include the right to commit perjury. *United States v. Osuorji*, 32 F.3d 1186, 1191 (7th Cir.1994). Thus, we cannot say that the district court erred by applying the obstruction enhancement to Fiore's base level offense.

## C. The Sufficiency of Evidence on Fiore's Conviction

Fiore next contends that the government failed to provide sufficient evidence for the jury to find beyond a reasonable doubt that he committed the crimes charged. As we have often explained, when we review for sufficiency of evidence, the appellant "faces a nearly insurmountable hurdle ... [in that] we consider the evidence in the light most favorable to the [g]overnment, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir.

1999) (citing *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir.1997)).

Fiore's primary argument in support of his sufficiency challenge is that juice loan debtor Varchetto and Crew member Tolomeo, both government witnesses, lacked credibility. Questions of witness credibility are reserved for the jury, and the jury's assessments will not be second-guessed by an appellate panel. *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir.1996). However, "[w]e will overturn a conviction based on a credibility determination ... when a witness's testimony was incredible as a matter of law." *United States v. Saulter*, 60 F.3d 270, 275 (7th Cir.1995).

Fiore asserts that Varchetto should not be believed because he is untruthful and Tolomeo should not be believed because he engaged in criminal activity while a member of the Witness Security Program. These accusations do not form the basis to overturn a conviction. The record does not show that either Tolomeo or Varchetto perjured himself at trial. Fiore was given the opportunity to cross-examine adverse witnesses throughout the trial. As we have said before, "[w]hen a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere." *Alcantar*, 83 F.3d at 189. Thus, we deny Fiore's credibility argument.

Fiore also asserts that there is no evidence linking the green address book that contained the name and coded telephone numbers of juice loan debtors to him. The trial record, however, tells another story. The record shows that the green address book was recovered from Fiore's house and was situated in a cabinet near the telephone. Furthermore, several of Fiore's juice loan debtors testified that they recognized their names and phone numbers that appeared in the green address book and that they had personally received juice loans from, or made pay-

ments to, Fiore. There was more than sufficient evidence for a jury to conclude that the green address book belonged to Fiore.

Accordingly, we hold that the government presented sufficient evidence from which a rational jury could have found Fiore guilty beyond a reasonable doubt.

### D. Bombacino's Sentencing Arguments

#### 1. Obstruction of Justice

■■■■■■ We now move to Bombacino's appeal, in which he challenges several aspects of his sentence. First, Bombacino argues that the district court erroneously imposed a two-point increase for obstruction of justice. However, Bombacino waived any obstruction of justice argument when he knowingly entered into a plea agreement with the government in which he stipulated that he obstructed justice by instructing witnesses to lie to federal agents. A defendant may not withdraw from portions of a plea agreement; he may sometimes withdraw from the plea agreement in its entirety and go to trial or he must abide by the plea agreement in its entirety. *See United States v. Martinez,* 122 F.3d 421, 422 (7th Cir.1997). "It is inappropriate to take a blue pencil to the agreement, removing the provisions that in retrospect the defendant wishes were not there." *Id.* at 423 (citing *United States v. Wenger,* 58 F.3d 280, 282–83 (7th Cir. 1995)). When Bombacino signed the plea agreement, he knowingly waived the right to contend that he did not obstruct justice.

#### 2. Acceptance of Responsibility

■■■■■■ We next consider Bombacino's contention that he should have received a two-point decrease in his base level offense for acceptance of responsibility. The district court denied Bombacino's request for an acceptance reduction, citing his attempt to minimize his role in the Crew's illegal conduct, his obstruction of the federal investigation, and destruction of evidence. In challenging the district court's finding,

Bombacino bears the burden of proving that he is entitled to a reduction in base offense level for acceptance of responsibility. *United States v. Purchess,* 107 F.3d 1261, 1266 (7th Cir.1997). The district court's acceptance of responsibility determination is a factual finding which we review for clear error. *United States v. Gibson,* 155 F.3d 844, 848 (7th Cir.1998).

■■■ Sentencing courts must look beyond formalistic expressions of culpability and determine whether the defendant has manifested an acceptance of responsibility for his offense in a moral sense. *United States v. Zaragoza,* 123 F.3d 472, 480 (7th Cir.1997); *see also United States v. Dvorak,* 41 F.3d 1215, 1217 (7th Cir.1994) (holding that the sentencing judge is to look for a defendant's demonstration of "genuine remorse," or "conscience" in determining whether the acceptance of responsibility reduction applies). This Court has, on many occasions, affirmed the denial of an acceptance reduction where the defendant has denied or attempted to minimize his role in the offense. *See, e.g., United States v. Jones,* 52 F.3d 697, 701 (7th Cir.1995) (affirming the denial of an acceptance reduction where defendant "had not fully admitted the extent of her participation in the fraudulent scheme"); *United States v. Linnear,* 40 F.3d 215, 222 (7th Cir.1994) (finding no acceptance of responsibility where defendant had denied, *inter alia,* that he had a supervising role in the criminal organization); *United States v. Garcia,* 35 F.3d 1125, 1133 ·(7th Cir. 1994) (holding that the challenge to the denial of the acceptance reduction was "groundless" where the defendant was "less than truthful in describing his role in the offense"). Furthermore, Application Note 1 to § 3E1.1 makes clear that the false denial or frivolous contesting of relevant conduct is inconsistent with acceptance of responsibility.

Our review of the record confirms the district court's position. Bombacino's version of his offense minimizes, if not trivializes, the role he played in the Crew's

activities. Contrary to his assertions, Bombacino was not coerced into joining the Crew. Rather, he embraced and maintained his role as an aggressive player in the Crew's illegal activities. He was heavily involved in the collection of juice loans. He made threats, brandished weapons, and used organized crime connections to place juice loan victims in fear of their own lives or the lives of their families. The district court's refusal to grant Bombacino an acceptance reduction was not in error.

### 3. Reduction for a Minor Role

Next, Bombacino contends that the district court erred by refusing to decrease his offense level by two points, pursuant to U.S.S.G. § 3B1.2(b), based on his status as a "minor participant." Section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Comment Backg'd; *see United States v. DePriest*, 6 F.3d 1201, 1214 (7th Cir.1993). A defendant is entitled to a two-level reduction if, "[b]ased on the defendant's role in the offense ... the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). The defendant bears the burden of establishing "minor participant" status. *United States v. Beltran*, 109 F.3d 365, 370 (7th Cir.1997). We review the district court's determination regarding a defendant's role in the offense for clear error. *United States v. Boatner*, 99 F.3d 831, 838 (7th Cir.1996).

"For purposes of § 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 3. Here, Bombacino has failed to demonstrate that he was a minor participant. First, Bombacino pleaded guilty to charges specific to his conduct, such as witness intimidation. As the sole participant in his conduct relating to witness intimidation, he cannot claim that his role was minimal. *See United States v. Lampkins*, 47 F.3d 175, 181 (7th Cir.1995) (noting that "it makes no sense to claim that one is a minor participant in one's own conduct"). Second, Bombacino was charged as a co-conspirator in the racketeering charges against the Crew and the record shows that he was anything but a minor participant in the conduct relating to the conspiracy charges. In fact, Bombacino played an integral role in the Crew's juice loan collections. He was not entitled to the adjustment for minor-participant status.

### 4. Bombacino's Request for a Downward Departure

In Bombacino's final argument, he contends that the district court erred by not departing downward from his sentence. This claim can be disposed of in short order. Although not specifically stated, Bombacino argues that the district court should have exercised its discretion to depart downward under U.S.S.G. § 4A1.3 because "some co-defendants ... [were] far more culpable than the defendant." However, to resolve this argument, we need not consider whether Bombacino was more or less culpable than his co-defendants. We cannot review a district court's discretionary refusal to depart from the sentencing range recommended by the Guidelines unless that refusal was based on the court's erroneous belief that it had no power to make the requested departure. *United States v. Griffin*, 150 F.3d 778, 788 (7th Cir.1998); *United States v. Hillsman*, 141 F.3d 777, 780 (7th Cir. 1998).

Here, the record does not reveal, nor does Bombacino claim, that the district court was unaware of its power to make the downward departure. Rather, the record shows that the district court was presented with the same departure requests that Bombacino makes before this Court and that the district court chose not to grant his request for a downward depar-

ture. We therefore affirm Bombacino's sentence.

AFFIRMED.