In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2962, 99-3588 & 99-3781

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LARRY E. STOTT, JR., ROBERT A. GAUGHAN,
also known as BOB, and LONNIE M. FORD,
also known as LONNIE,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 97 CR 168--James T. Moody, Judge.

Argued May 10, 2000--Decided March 26, 2001

Before EASTERBROOK, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge. Larry Stott, Robert Gaughan and Lonnie Ford were all arrested and charged with various crimes arising out of an alleged conspiracy to distribute cocaine and cocaine base. A jury convicted all three men. All of the defendants allege errors in the trial that led to their convictions; Mr. Gaughan and Mr. Ford also appeal their sentences. For the reasons set forth in the following opinion, we affirm the convictions and Mr. Ford's sentence. However, we vacate Mr. Gaughan's sentence and remand for resentencing.

I
BACKGROUND
A. Facts

On December 8, 1997, DeShon Anderson and Jerry Bonner were arrested while in possession of marijuana, cocaine and cocaine base. Bonner told Drug Enforcement Administration ("DEA") Agent Maurice King that he would cooperate with the DEA. Bonner further informed Agent King that he had acquired the cocaine and cocaine base from Robert Gaughan on a consignment basis and was transporting the drugs to Lonnie Ford in Indianapolis.

Bonner then allowed the DEA to record telephone conversations he had with Mr. Gaughan and Mr. Ford. In one of these conversations, Bonner arranged for a sale of cocaine to Mr. Ford on December 8. When Bonner arrived at the rendezvous site with Agent King, however, Mr. Ford was not there. Bonner contacted Mr. Ford, who said that he had left the site when he spotted law enforcement officials. Bonner and Mr. Ford set a new rendezvous point at a service station. Mr. Ford arrived at that rendezvous with Larry Stott. Agent King, who was listening to Bonner's conversation through a microphone Bonner was wearing, heard Mr. Ford tell Bonner that one of the cars at the service station was a police car. Agent King then advised the other officers that Mr. Ford was aware of their presence, and the agents arrested Mr. Ford and Mr. Stott at the scene. Mr. Ford never took physical possession of any drugs from Bonner.

At the time of the arrest, agents searched Mr. Ford's vehicle and found a gun in the back seat armrest. The gun was not loaded, but a loaded magazine was found in the front seat armrest. Agents also uncovered $8,000 during the search.

After the arrest of Mr. Ford, Bonner continued to speak to Mr. Gaughan by telephone, and he arranged to meet Mr. Gaughan on December 15 in Indiana to pay Mr. Gaughan for cocaine previously provided to Bonner. Mr. Gaughan, who lived in Chicago, arrived in the company of Lori Kulikowski; Bonner arrived with Agent King. At the meeting, Bonner put a bag, supposedly containing money Bonner owed Mr. Gaughan, into Mr. Gaughan's car. Agents then moved in and arrested Mr. Gaughan and Kulikowski. A search of Mr. Gaughan's car revealed a loaded .38 Smith and Wesson revolver.

After the arrest, Mr. Gaughan and Kulikowksi were transported to the Munster Police Department. There Mr. Gaughan was interviewed by Agent King and others. At that time, Gaughan said that he had sold 20 to 30 kilograms of cocaine to Bonner in the past. He also gave the agents information concerning his supply source.

At some point, the agents discovered that Mr. Gaughan was a diabetic and suffered from cardiovascular disease. According to Mr. Gaughan, he informed officers about his condition and also told them that he was experiencing cramps, nauseousness, clamminess and shortness of breath. Despite this information, the officers refused to retrieve Mr. Gaughan's medication from his car or to contact a physician until he had signed a waiver of his rights. The officers' recollection differed from Mr. Gaughan's. The officers testified that, although they knew of Mr.

Gaughan's conditions, he was asked if he was all right and if he needed anything; Mr. Gaughan responded that he did not./1

B. District Court Proceedings
1.

Mr. Stott, Mr. Gaughan, Mr. Ford, Anderson, Bonner and Kulikowski were all indicted on multiple counts relating to their alleged drug distribution activities./2 Anderson and Bonner both pleaded guilty, and Bonner agreed to testify for the Government against the other defendants. Mr. Stott, Mr. Gaughan and Mr. Ford elected to stand trial./3

At trial, Agent King testified that Mr. Gaughan made a statement after his arrest in which he admitted that he had supplied Bonner with cocaine on 20 to 30 occasions. According to Agent King, Mr. Gaughan also said that his purpose in meeting Bonner in Indiana was to receive payment for cocaine that he had given to Bonner to sell on consignment./4

Bonner testified that he had obtained cocaine from Mr. Gaughan beginning in the spring of 1997 and that, after a while, Mr. Gaughan began providing the drugs on a consignment basis. Bonner would then sell the cocaine to Mr. Ford. When Mr. Gaughan began consigning drugs to Bonner, he in turn provided drugs on consignment to Mr. Ford. Bonner testified that, at first, he acquired cocaine from Mr. Gaughan in powder form and resold it to Mr. Ford in that same form. However, after October 1997, Bonner converted some cocaine to cocaine base, also known as crack, before providing it to Mr. Ford.

At some point during Bonner's dealings with Mr. Ford, Mr. Ford introduced Bonner to Mr. Stott. Mr. Ford told Bonner that Mr. Stott was "his guy" and would be transporting the cocaine on Mr. Ford's behalf. Trial Transcript ("Tr.") at 302. After Bonner's initial meeting with Mr. Stott, Mr. Stott came to Bonner's house to pick up drugs and also traveled with Mr. Ford to meet Bonner for the purpose of purchasing cocaine.

2.

The jury returned different verdicts against each defendant. Mr. Stott was convicted on Count IV (interstate travel in aid of an unlawful activity, December 8, 1997)./5 The jury convicted Mr. Gaughan on Count I (conspiracy to possess with intent to distribute), Count III (possession with intent to distribute cocaine, December 8, 1997), Count IV and Count VII

(carrying a firearm during and in relation to the conspiracy to possess with intent to distribute cocaine, December 15, 1997). Mr. Ford was convicted on Count II (possession with intent to distribute more than 50 grams of cocaine base, December 8, 1997), Count III, Count IV and Count V (carrying a firearm during and in relation to a conspiracy to possess with intent to distribute, December 9, 1997). The district court then proceeded to sentencing.

To arrive at the appropriate offense level for Mr. Gaughan and Mr. Ford, the district court first determined the amount and kind of drugs attributable to each defendant. The district court found that Mr. Gaughan had delivered 30 kilograms of cocaine powder to Bonner. It further concluded that it was foreseeable to Mr. Gaughan that at least 1.5 kilograms would have been converted to crack cocaine. These amounts resulted in an offense level of 38 and, in combination with Mr. Gaughan's criminal history category, a sentencing range of 235 to 293 months. The district court sentenced Mr. Gaughan to the minimum for his guideline range, 235 months.

The court undertook a similar analysis for Mr. Ford. The court attributed 1.5 kilograms of crack to Mr. Ford, mandating a base offense level of 38. It also gave him a two-level supervisory enhancement. As a Category V offender with a total offense level of 40, Mr. Ford was eligible for a sentence of 360 months to life. The district court sentenced him to 360 months.

The defendants appealed and now challenge various aspects of their convictions and sentences.

II
DISCUSSION
A.  Trial Issues

1.  Insufficiency of the evidence against Mr. Stott

Mr. Stott was charged with violating the Travel Act, 18 U.S.C. sec. 1952,/6 both as a principal and as an aider and abettor. He contends that the evidence against him was insufficient to support his conviction. Specifically, Mr. Stott maintains that Bonner's testimony was conflicting and unreliable and, therefore, was not sufficient to support his conviction. Mr. Stott also claims that his conviction for violating the Travel Act is inconsistent with his acquittal on all of the other counts. We address each argument below.

With respect to his first argument, Mr. Stott

claims that Bonner's testimony was often vague and points out that Bonner never testified at trial that Mr. Stott was a customer of his. Thus, Mr. Stott claims, Bonner's testimony is not credible and is insufficient to support the conviction. However, it is not the role of the appellate court to question the jury's credibility determinations. See United States v. Durham, 211 F.3d 437, 445 (7th Cir. 2000); United States v. Alcantar, 83 F.3d 185, 189 (7th Cir. 1996) ("Questions of witness credibility are reserved for the jury, and its assessments will not be second-guessed by an appellate panel."). We shall not find a witness' testimony insufficient to sustain a conviction because it might have omitted some details or might be characterized as vague; we shall reverse a jury verdict only if the testimony was incredible as a matter of law. See United States v. Griffin, 194 F.3d 808, 817 (7th Cir. 1999), cert. denied, 529 U.S. 1044 (2000). To meet this standard, "a defendant must show that testimony was . . . contrary to the laws of nature or unbelievable on its face." United States v. Scott, 145 F.3d 878, 883 (7th Cir. 1998). Mr. Stott has not met this burden with respect to Bonner's testimony, and, consequently, we shall not overturn the jury's verdict.

Mr. Stott also urges us to overturn his conviction because it is inconsistent with his acquittal on the other counts in the indictment. However, it is well-established in this circuit that "[a] conviction by a jury on one count cannot be reversed simply because it was inconsistent with the jury's verdict of acquittal on another count." United States v. Muthana, 60 F.3d 1217, 1223 (7th Cir. 1995). Consequently, the inconsistency, without more, does not warrant overturning Mr. Stott's conviction.

2.  Challenges by Mr. Gaughan

(a)

Mr. Gaughan maintains that his due process rights were violated when the Government failed to provide Agent King's grand jury testimony to him prior to the suppression hearing on his in-custody statements. According to Mr. Gaughan, the Government had a duty to provide the material prior to the suppression hearing pursuant to the rule of Brady v. Maryland, 373 U.S. 83 (1963). We set forth below the facts relevant to Mr. Gaughan's contention.

After Mr. Gaughan's arrest, he made a statement to Agent King in which, according to Agent King, Mr. Gaughan admitted supplying Bonner with cocaine on many occasions. Furthermore, Mr.

Gaughan admitted that on the day of his arrest he had been traveling to Indiana to receive payment for cocaine he had fronted to Bonner.

Prior to trial, Mr. Gaughan moved to suppress this statement on the ground that agents coerced the statement from him by exploiting his serious medical condition./7 At the suppression hearing, Mr. Gaughan introduced testimony from medical experts explaining that at the time of his arrest he was taking multiple medications for both diabetes and cardiovascular disease. Mr. Gaughan testified that, as the officers approached the car to arrest him, he stated: "Look, I'm a heart patient and I'm diabetic. I haven't had may [sic] medication this evening yet." Suppression Hearing Transcript ("Supp. Tr.") at 35. After his arrest, he repeatedly told officers that he did not feel well and asked for his medication; the agents, however, refused to provide him with his medication until he answered their questions and made recorded telephone calls to his supplier.

The agents present during the interview contradicted Mr. Gaughan's version of events. Specifically, Officer Thomas Stipanich testified that, during the course of questioning Mr. Gaughan, he became aware of Mr. Gaughan's medical conditions. Then, according to the officer, "[w]e asked him if he needed any immediate medical attention. He told us no, that he does take pills and things like that for him. [He] [d]id not request any medical assistance at all." Supp. Tr. at 72. DEA Agent Maurice King also testified at the suppression hearing. Agent King recalled that Mr. Gaughan's medical condition came up and that "he was offered--he was asked whether he needed anything. And he basically said no, some water." Supp. Tr. at 120. Finally, DEA Agent Tom Decanter testified that he had observed that Mr. Gaughan looked nervous during his interview. At that point, Agent Decanter inquired whether Mr. Gaughan was okay. Mr. Gaughan then informed the officers of his medical condition. Like the other officers who testified, Agent Decanter stated that Mr. Gaughan was asked if he needed anything and that Mr. Gaughan responded that he did not.

Including the testimony set forth above, evidence at the hearing established that, after Mr. Gaughan's interview, he was transported to the Calumet City police station where he was to be held until his initial appearance the next morning. After being checked in, Mr. Gaughan requested medical assistance and was taken to a local hospital for treatment. Against his doctors' recommendation, Mr. Gaughan checked himself out of the hospital the next morning.

Based on the evidence presented at the hearing,

the district court denied the motion to suppress. The court rejected Mr. Gaughan's arguments that the statement was coerced and allowed the statement to be used at trial. It stated:

> The Defendant did not ask the arresting officers for his medication or for medical assistance.

> The Defendant did not tell the arresting officers that he was not feeling well, suffering chest pains, feeling faint or suffering from any other discomfort.

> The Court further finds that the statements that this--that the Defendant seeks to suppress were made knowingly and voluntarily, and not as the result of coercion, breach of promises or lack of medical assistance and medication. Therefore, the Defendant's Motion to Suppress is denied.

Supp. Tr. at 151-52.

Agent King's testimony at the suppression hearing differed in some respects from the testimony that he had given before the grand jury. In front of the grand jury, Agent King apparently stated that, after being transported from the initial interview site, Mr. Gaughan asked for his medications, that agents had gone to Mr. Gaughan's car to gather the medications but that only an empty bottle of medication was found in the car. On cross-examination of Agent King at Mr. Gaughan's sentencing hearing, counsel established that Mr. Gaughan's request for his medication must have been made before Mr. Gaughan was transported because his car was not taken to Calumet City. See Gaughan Sentencing Transcript ("Gaughan Sent. Tr.") at 20-24.

The prosecution did not inform the defense of Agent King's grand jury testimony prior to the suppression hearing; thus, at the suppression hearing, Mr. Gaughan could not impeach Agent King with his earlier statements. However, the statements to the grand jury apparently were provided to the defense prior to trial, and the statements were used for impeachment purposes both at trial and, as noted above, at the sentencing hearing. After learning of the grand jury testimony, Mr. Gaughan did not argue that the disclosure was belated or renew his motion to suppress.

On appeal, Mr. Gaughan argues that the rule of Brady v. Maryland applies to suppression hearings and, in these circumstances, required the Government to furnish Agent King's grand jury testimony prior to the suppression hearing. Because Mr. Gaughan did not present this argument to the district court, our review is only for plain error. See United States v. Brumley, 217

F.3d 905, 909 (7th Cir. 2000)./8

In United States v. Olano, 507 U.S. 725 (1993), the Supreme Court explained the criteria for establishing "plain error." First, the error must be "plain." The court explained that, properly understood, "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" Id. at 734. It is inappropriate, therefore, to find plain error when current law is unsettled. See, e.g., United States v. Stafford, 136 F.3d 1109, 1114 (7th Cir. 1998); United States v. Klinger, 128 F.3d 705, 712 (9th Cir. 1997); United States v. Brewer, 1 F.3d 1430, 1435 (4th Cir. 1993). Second, the error must affect "substantial rights." Olano, 507 U.S. at 734. In order to meet this burden, "[n]ormally, . . . the defendant must make a specific showing of prejudice . . . ." Id. at 735. Finally, the error must "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." Id. at 736. According to the Court, this last requirement will always be met if "a plain forfeited error . . . cause[d] the conviction or sentencing of an actually innocent defendant"; however, it was not willing to define this last element strictly in terms of actual innocence. Id. With these standards in mind, we turn to Mr. Gaughan's Brady claim.

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Since Brady, the scope of the prosecutor's duty to disclose such information has been more sharply refined in several important respects: The duty is applicable regardless of whether there has been a request by the accused, see United States v. Agurs, 427 U.S. 97, 107 (1976); the duty encompasses impeachment evidence as well as exculpatory evidence, see United States v. Bagley, 473 U.S. 667, 676 (1985); and the duty applies to evidence known to police investigators even if unknown to the prosecutor, see Kyles v. Whitney, 514 U.S. 419, 438 (1995). See also Strickler v. Greene, 527 U.S. 263, 280-81 (1999). However, a Brady violation only occurs if "material" evidence is withheld, that is "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Furthermore, "[a]s long as ultimate disclosure is made before it is too late for the defendants to make use of any benefits of evidence, Due Process is satisfied." United States v. Ziperstein, 601 F.2d 281, 291 (7th Cir. 1979).

The Government does not argue that Agent King's testimony was not valuable for impeachment. Instead, it contends that Brady does not require the disclosure of exculpatory or impeachment material prior to a suppression hearing. The rule of Brady, contends the Government, only applies to evidence that is material to either guilt or punishment; therefore, disclosure prior to the suppression hearing was not required. Because the duty only applies to the guilt or punishment phase, the Government submits that it fulfilled its obligations under Brady by providing the material prior to trial.

We find it unnecessary to decide whether Brady applies to suppression motions because it is clear that the district court did not commit plain error by not applying Brady here. Although, as noted above, the rule of Brady has been refined in several respects, the Supreme Court has not had the occasion to determine whether this rule requires disclosure of impeachment evidence prior to a suppression hearing. Similarly, we have not had an opportunity to focus definitively on this issue. Mr. Gaughan points to United States v. Veras, 51 F.3d 1365 (7th Cir. 1995), as support for his argument that the issue has been resolved in favor of extending Brady disclosure requirements to suppression hearings. In Veras, the defendant had moved for a new trial based on the government's failure to disclose impeachment evidence concerning one of the government's primary witnesses; the witness had testified both at a suppression hearing and at trial. The district court denied the motion for a new trial on the ground that the undisclosed information was not material because it was inadmissible under Federal Rule of Evidence 608(b). The district court concluded that, "[b]ecause the suppressed evidence would not have affected the outcome of the suppression hearing or the trial, defendant's due process rights were not violated and his motion for a new trial pursuant to Brady and Giglio [v. United States, 405 U.S. 150 (1972)] is denied." Id. at 1375. In reviewing the district court's rationale for denying the new trial motion, we stated that "[w]e [found] no fault with the district court's holding." Id.

Given the context in which this statement arose, we cannot conclude that it squarely establishes that Brady applies to suppression hearings. The issue came to us as part of a new trial motion that involved both a pretrial suppression hearing and a trial. The district court did not address the issues separately. Furthermore, because the defendant appealed from the denial of the new trial motion, this court did not have the

occasion or the need to address, as a discreet issue, Brady's application to a pretrial suppression hearing. We consequently cannot conclude that our holding in Veras makes it "obvious" that Brady disclosures are required prior to suppression hearings.

Furthermore, there is no consensus among the other circuits as to whether Brady should apply to suppression hearings. The Ninth Circuit has held explicitly that it does, at least with respect to some categories of suppression hearings. See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993) ("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."). The Fifth Circuit, too, has applied Brady disclosure requirements to a motion to suppress, see Smith v. Black, 904 F.2d 950, 965–66 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930 (1992); however, the undisclosed evidence in that case was found to be immaterial, see id. at 966. The Fourth Circuit has taken an approach similar to the one we took in Veras, assuming without deciding that Brady applies to suppression hearings. See United States v. Williams, 10 F.3d 1070, 1077 (4th Cir. 1993) ("Even if Brady were applicable in the context of a pretrial suppression hearing, application of the law to the facts of the instant case would not require a different result. . . . In light of the inconsequential nature of the Brady case to these proceedings, we assume arguendo but decline to address definitively on the merits the issue of whether Brady should call for disclosure of material evidence at pre-trial suppression hearings.")./9 The District of Columbia Circuit however, has expressed its doubts as to whether Brady applies to suppression hearings. See United States v. Bowie, 198 F.3d 905 (D.C. Cir. 1999). Focusing on the same language as the Government, that circuit stated: "[I]t is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings. Suppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" Id. at 912 (quoting Brady, 373 U.S. at 87).

In summary, we cannot say that the law is clear on the question of whether Brady should apply to suppression hearings. There is no clear statement on the issue from either the Supreme Court or this court, and there is no prevailing national standard. Because the law concerning Brady's application to suppression hearings is not "clear" or "obvious," we cannot find plain error.

Olano, 507 U.S. at 734; see also United States v. Pandiello, 184 F.3d 682, 688 (7th Cir. 1999); United States v. Lindsey, 123 F.3d 978, 985 (7th Cir. 1997); United States v. Mims, 92 F.3d 461, 465 (7th Cir. 1996).

However, we have, in the present case, an even more compelling reason to reject Mr. Gaughan's Brady claims. To meet the plain error standard, Mr. Gaughan must establish that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736. We do not believe that this criterion has been satisfied. In the present action, it is undisputed that the Government did not produce Agent King's grand jury testimony prior to the suppression hearing on Mr. Gaughan's post-arrest statements, the time in the usual course of judicial proceedings that the evidence would have been most useful to Mr. Gaughan. However, the record shows that the grand jury testimony was disclosed prior to the admission of Mr. Gaughan's statement into evidence at trial and, therefore, at a time when Mr. Gaughan's counsel still had the option of asking the district court to reconsider its ruling on the motion to suppress. Indeed, the record not only establishes that the material was in the hands of the defense at this time, but also that it was used by the defense to cross-examine Agent King and to undermine his credibility. Under these circumstances, we do not believe that the Government's failure to disclose Agent King's grand jury testimony prior to the suppression hearing "seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings." Consequently, Mr. Gaughan has not established that the Government's failure rose to the level of "plain error."

(b)

Mr. Gaughan objects to the district court's instruction to the jury regarding the fronting of cocaine. The instruction read as follows:

The delivery of drugs with an agreement to pay for them after a subsequent sale is typically referred to as "fronting." The repeated "fronting" of cocaine, alone, may be sufficient to establish a conspiracy.

R.295, Inst. 34A. Mr. Gaughan contends that this instruction improperly highlights "fronting" as a method by which conspiracy may be proven. We review a claim of instructional error for an abuse of discretion. See United States v. Aldaco, 201 F.3d 979, 989 (7th Cir. 2000); United States v. Wilson, 159 F.3d 280, 291 (7th Cir. 1998), cert. denied, 527 U.S. 1024 (1999).

The district court's instruction relied upon our opinion in United States v. Ferguson, 35 F.3d 327 (7th Cir. 1994). In that case, we wrote that "[t]he repeated 'fronting' of cocaine, alone, has been held sufficient to support the jury's conclusion that the defendant had knowingly joined a distribution conspiracy." Id. at 331. The principle stated in Ferguson continues to be the law of this circuit. See, e.g., United States v. Frazier, 213 F.3d 409, 415 (7th Cir. 2000) ("We have held that an ongoing relationship involving numerous purchases and the fronting of drugs indicates the existence of a conspiracy."), cert. denied, 2001 WL 135828 (Feb. 16, 2001). Thus, the district court's instruction was a correct statement of the law. "If the instructions are adequately supported by the record and are fair and accurate summaries of the law, the instructions will not be disturbed on appeal." United States v. Lanzotti, 205 F.3d 951, 956 (7th Cir.), cert. denied, 120 S. Ct. 2746 (2000); see also Aldaco, 201 F.3d at 989; United States v. Wimberly, 79 F.3d 673, 676 (7th Cir. 1996). Mr. Gaughan has not argued that the fronting instruction was inadequately supported by the record, and we believe that it was a fair and accurate summary of the law. Accordingly, we shall not vacate Mr. Gaughan's conviction on the ground that this instruction tainted his trial.

### 3. Challenges by Mr. Ford

(a)

Mr. Ford first challenges his convictions for possession with intent to distribute cocaine or cocaine base./10 As described above, Bonner had arranged to meet Mr. Ford on December 8, for the purpose of conducting a sale of cocaine and cocaine base. However, before the exchange took place, Mr. Ford became aware that law enforcement was present and the officers on the scene arrested Mr. Ford before he took actual possession of the drugs. Mr. Ford contends that this lack of actual possession precludes a conviction for possession with intent, which requires a defendant to have either dominion or control over the drugs at issue. In the district court, Mr. Ford moved for an acquittal on this basis. However, the district court rejected Mr. Ford's argument and, in a postconviction ruling, explained that Mr. Ford's conviction could be sustained on the ground that he had aided and abetted Bonner's possession of the cocaine.

When considering a criminal defendant's challenge to the sufficiency of the evidence supporting his conviction, we review the evidence in the light most favorable to the government. We

shall reverse a conviction only if no rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. See United States v. Jones, 188 F.3d 773, 776 (7th Cir.), cert. denied, 528 U.S. 1033 (1999); United States v. Gibbs, 61 F.3d 536, 537 (7th Cir. 1995). However, any questions of law raised by Mr. Ford's challenge are reviewed de novo. See United States v. Hoogenboom, 209 F.3d 665, 669 (7th Cir. 2000); United States v. Irwin, 149 F.3d 565, 569 (7th Cir. 1998).

We believe the law and the record support the district court's determination that Mr. Ford aided and abetted Bonner's possession of cocaine and cocaine base. The aiding and abetting statute, 18 U.S.C. sec. 2, states: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Id. sec. 2(a). To be convicted as an aider and abettor, it must be shown that Mr. Ford associated himself with the activity at issue and that he tried to make the activity succeed. See United States v. Heath, 188 F.3d 916, 921 (7th Cir. 1999); United States v. Coleman, 179 F.3d 1056, 1061 (7th Cir.) ("To sustain the conviction under a theory of aiding and abetting, we must find that the government proved that Coleman knowingly participated in the transaction as something he wished to bring about and that he sought by his actions to make it succeed.") (internal quotation marks and citations omitted), cert. denied, 528 U.S. 957 (1999)./11

In denying Mr. Ford's motion for acquittal or a new trial, the district court relied on our decision in United States v. Wesson, 889 F.2d 134 (7th Cir. 1989). In that case, we held:
You may "abet" the crime of possession with intent to distribute by procuring the customers and maintaining the market in which the possession is profitable, even though you do nothing else to help the possessor get or retain possession. Middlemen aid and abet the offense of possession with intent to distribute.
Id. at 135. Mr. Ford contends, however, that he was not a middleman such as Wesson, but instead was only a buyer with interests distinct from those of Bonner. Because his relationship with Bonner was merely that of a buyer and a seller, Mr. Ford argues, he cannot be found to have aided and abetted Bonner's possession.

The Government counters that the prior relationship between Mr. Ford and Bonner makes Mr. Ford more than a mere buyer. In making its argument, the Government draws on cases from the law of conspiracy. The Government argues that because Bonner routinely fronted drugs to Mr.

Ford, Mr. Ford could be considered part of a conspiracy with Bonner. As we stated earlier, it is well-established in this circuit that the repeated fronting of drugs may demonstrate the existence of a conspiracy. See Frazier, 213 F.3d at 415; Ferguson, 35 F.3d at 331; United States v. Cabello, 16 F.3d 179, 182 (7th Cir. 1994). The Government contends that because it established that Bonner routinely fronted drugs to Mr. Ford, a conspiracy existed between them; thus, it claims, Mr. Ford may properly be considered to have aided and abetted Bonner.

We cannot accept the Government's arguments for several reasons. First, the Government's position is premised on a conspiracy theory, but Mr. Ford was not convicted of conspiracy. Second, the Government's argument implies that aiding and abetting is a lesser included offense of conspiracy, however, in the context of a federal drug prosecution, it is not. See United States v. Shabani, 513 U.S. 10, 14-15 (1994). When proof of one crime requires proof of an element not necessary to prove a second crime, the first crime is not a lesser included offense of the second. See, e.g., Schmuck v. United States, 489 U.S. 705, 716 (1989). In this type of proceeding, to win a conviction for aiding and abetting the Government must prove an element not necessary to prove conspiracy: the existence of an overt act by the defendant. Compare Lanzotti, 205 F.3d at 956 ("Under federal law, the crime of aiding and abetting requires knowledge of the illegal activity that is being aided and abetted, a desire to help the activity succeed and some act of helping." (emphasis added)) with United States v. Hunte, 196 F.3d 687, 691 (7th Cir. 1999) ("[C]onspiracy liability does not require evidence of an overt act by the defendant."). Because aiding and abetting is not a lesser included offense of conspiracy, the Government's evidence showing the existence of a conspiracy does not automatically demonstrate that Mr. Ford aided and abetted Bonner.

Nonetheless, we believe that Mr. Ford's conviction may be affirmed. Although the Government improperly focuses on the fact that the fronting of drugs supports a conspiracy conviction, we also have held that the fronting of drugs supports an aiding and abetting conviction:

Furthermore, sales on credit, in combination with frequent and repeated transactions, justify an aider and abettor instruction. See, e.g., United States v. Blankenship, 970 F.2d 283, 287 (7th Cir. 1992); United States v. Kasvin, 757 F.2d 887, 891 (7th Cir. 1985). This same evidence would permit a jury to infer that Rivera did not

have a mere buyer/seller arrangement with Bradley.

United States v. Rivera, 153 F.3d 809, 814 (7th Cir. 1998). A person who receives fronted drugs for resale to others may be considered a middleman rather than a buyer, and we have held that "middlemen aid and abet the offense of possession with intent to distribute." United States v. McNeese, 901 F.2d 585, 609 (7th Cir. 1990) (quoting Wesson, 889 F.2d at 135), overruled on other grounds, United States v. Westmoreland, 240 F.3d 618 (7th Cir. 2001). Consequently, Mr. Ford's conviction as an aider and abettor may be affirmed if there is evidence indicating that Bonner fronted him cocaine on a repeated basis.

The record contains such evidence. Bonner testified specifically that he fronted drugs to Mr. Ford. Bonner stated that, when Mr. Gaughan began fronting drugs to him, he in turn began fronting drugs to Mr. Ford:

Q.  And once you were fronted by Bob [Gaughan], how would that change your relationship with Lonnie [Ford]?
A.  Well, I would front him too.
Q.  What does that mean, front?
A.  Front means to--you receive the merchandise without paying all the money or any of the money. You pay the money later but you get the merchandise first.

Tr. at 306-07. From this testimony, a reasonable jury could conclude that Bonner fronted cocaine to Mr. Ford. Because, as noted above, the repeated fronting of drugs supports a conviction for aiding and abetting the crime of possession with intent to distribute, we affirm Mr. Ford's conviction.

(b)

Mr. Ford also challenges his conviction for using or carrying a firearm during and in relation to a drug trafficking offense. Mr. Ford does not dispute that the evidence demonstrates that he brought a gun to his rendezvous with Bonner and that he intended to give Bonner that gun. Mr. Ford argues, however, that he brought the gun to Bonner for Bonner's personal protection and, therefore, the gun was unrelated to his (Mr. Ford's) participation in the drug trade. Thus, he claims, the gun was not related to a drug trafficking offense.

In addition to the penalties the Government may seek for drug traffickers, additional penalties may be sought for

any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm[.]

18 U.S.C. sec. 924(c)(1)(A). The term "in relation to" is "expansive" and means that "the gun at least must facilitat[e], or ha[ve] the potential of facilitating, the drug trafficking offense." Smith v. United States, 508 U.S. 223, 237-38 (1993) (internal quotation marks omitted); United States v. Haynes, 179 F.3d 1045, 1047 (7th Cir.) (quoting Smith), cert. denied, 528 U.S. 957 (1999). A conviction under sec. 924(c)(1) is inappropriate if "the firearm's presence is coincidental or entirely unrelated to the crime." Smith, 508 U.S. at 238 (internal quotation marks omitted); United States v. Taylor, 31 F.3d 459, 465 (7th Cir. 1994) (quoting Smith). However, "if the drugs and gun are together in the same place it is nearly an inescapable conclusion that they satisfy the in relation to prong of sec. 924(c)(1)." United States v. Pike, 211 F.3d 385, 389 (7th Cir. 2000) (quoting United States v. Molina, 102 F.3d 928, 932 (7th Cir. 1996)).

At trial, Bonner testified that he wanted the gun for personal protection, not necessarily the protection of his drugs. However, a few weeks prior to the rendezvous with Mr. Ford, Bonner's apartment was robbed, he was beaten, and some cocaine was taken. This event prompted Bonner to ask Mr. Ford for a gun. Mr. Ford agreed to provide Bonner with a gun, and delivery was intended to take place at the same time Mr. Ford purchased additional cocaine from Bonner.

We believe that, given the circumstances described above, the jury could conclude reasonably that Mr. Ford possessed the gun in relation to a drug trafficking offense. Mr. Ford knew Bonner only as his supplier. Furthermore, he knew that Bonner's desire for the weapon arose from the fact that drugs were taken from Bonner's apartment. In these circumstances, the presence of the gun could be considered by the jury as not merely coincidental or unrelated to Mr. Ford's drug trafficking. Instead, the jury was entitled to conclude that Mr. Ford provided the gun to Bonner, his supplier, for Bonner's protection as well as the protection of Bonner's cocaine, and that the weapon found in Mr. Ford's car therefore was related to his drug trafficking offense. We therefore affirm Mr. Ford's conviction on this count./12

4. Issues common to Mr. Ford and Mr. Gaughan

(a)

Mr. Ford and Mr. Gaughan raise jointly a claim of instructional error. They argue that the district court's jury instruction regarding vicarious liability for the acts of co-conspirators, pursuant to Pinkerton v. United States, 328 U.S. 640 (1946), was erroneous. The instruction, they claim, failed to convey to jurors that they had to find beyond a reasonable doubt that the substantive offense was committed by a co-conspirator in furtherance of or as a natural consequence of the conspiracy. Although trial counsel objected to the Pinkerton instruction in the district court, his objections were only of a general nature, and he did not raise this particular argument./13 Thus, our review is only for plain error. See United States v. Cooke, 110 F.3d 1288, 1293 (7th Cir. 1997) ("Although Cooke objected to instruction 22, he did so on grounds other than those asserted here. Accordingly, we review for plain error."); United States v. Roth, 860 F.2d 1382, 1390 (7th Cir. 1988) ("An objection that does not point out the problem in the instruction is insufficient because it does not give fair prospect of timely correction.").

The court's Pinkerton instruction stated:

A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of the conspiracy. Therefore, if you find a defendant guilty of the conspiracy as charged in Count 1 and if you find beyond a reasonable doubt that while that defendant was a member of the conspiracy, his fellow conspirators committed the offenses charged in Counts 2, 3, 4, and/or 5, then you should find him guilty of Counts 2, 3, 4, and/or 5.

R.295, Inst. 52. The Government argues that the instruction closely follows the language of Seventh Circuit Pattern Jury Instruction 5.09, that the first sentence of the instruction makes clear that Pinkerton liability only attaches when coconspirators act in furtherance of the conspiracy and that the jury was reminded repeatedly that its findings must be beyond a reasonable doubt. Consequently, in the Government's view, the instructions, taken as a whole, adequately informed the jury of the elements of the Pinkerton doctrine.

It is true that the first sentence of the court's instruction follows Pattern Instruction

5.09 to the letter. However, the second sentence of the pattern instruction states: "Therefore if you find a defendant guilty of the conspiracy charged in Count(s) ___ and if you find beyond a reasonable doubt that while he/she was a member of the conspiracy, his/her fellow conspirator(s) committed the offense(s) in Count(s) ___ in furtherance of and as a foreseeable consequence of that conspiracy, then you should find him/her guilty of Count(s) ___." Seventh Circuit Pattern Instruction 5.09 (emphasis added). At no other point in the instructions was the jury informed that, in order to hold a defendant liable for his coconspirator's crimes, the crimes must have been in furtherance of or a foreseeable consequence of the conspiracy.

We are not convinced that the instruction as given properly informed the jury of the necessary requirements for applying the Pinkerton doctrine. We have stated:

For a Pinkerton instruction to be adequate, it must focus the jury on the coconspirator's act, on whether it is a crime, on whether the coconspirator's guilt of this crime was proved beyond a reasonable doubt, and on whether it was committed in furtherance of the conspiracy in which the defendant participated. The instruction must also advise the jury that the government bears the burden of proving all elements of the doctrine beyond a reasonable doubt.

United States v. Sandoval-Curiel, 50 F.3d 1389, 1394-95 (7th Cir. 1995) (internal quotation marks and citations omitted). Here the instruction neither focused the jury on "whether [the crime] was committed in furtherance of the conspiracy" nor instructed the jury that this element must be found beyond a reasonable doubt. We previously have rejected Pinkerton instructions on similar bases. See United States v. Elizondo, 920 F.2d 1308, 1317 (7th Cir. 1990) (finding instructional error because the Pinkerton instruction "failed to advise jurors that the government bore the burden of proving that all elements of the powerful Pinkerton doctrine must be proven beyond a reasonable doubt"). Consequently, we cannot conclude that, under these circumstances,/14 the jury understood all of the elements necessary to hold a defendant vicariously liable for the acts of his coconspirators.

Although here the Pinkerton instruction was lacking, we believe that the defect cannot be characterized as plain error. Pinkerton liability is vicarious liability. However, with respect to Mr. Gaughan, there was direct evidence to support his convictions for Count III (possession with intent to distribute cocaine on December 8, 1997)

as an aider and abetter. See Elizondo, 920 F.2d at 1317 ("Alternative theories of direct and vicarious liability raised below exist for affirming the substantive-count convictions despite the defective Pinkerton instruction."). As we explained earlier, the fronting of drugs can support a conviction for aiding and abetting possession with intent to distribute narcotics. Here, Bonner testified that Mr. Gaughan had fronted Bonner the cocaine that he was carrying when he was arrested on December 8, 1997.

There is also direct evidence that Mr. Gaughan aided and abetted a violation of the Travel Act as set forth in Count VI (interstate travel in aid of an unlawful activity involving possession with intent to distribute cocaine). In order to aid and abet the Travel Act violation, the evidence must demonstrate that Mr. Gaughan had the state of mind required for the Travel Act offense and took some action intended to make the endeavor succeed, see id. at 1318; it was not necessary for the Government to show that Mr. Gaughan induced or even had knowledge of Bonner's interstate travel./15 See United States v. Abadie, 879 F.2d 1260, 1266 (5th Cir. 1989); see also United States v. Sigalow, 812 F.2d 783 (2d Cir. 1987) ("Our holding that an aider and abettor of a Travel Act violation need not have assisted in the use of interstate facilities is consistent with the reasoning of other circuits."). Mr. Gaughan's fronting of the drugs to Bonner meets this criterion.

Mr. Ford's challenge is even less meritorious. Mr. Ford was not convicted of the conspiracy charged in Count I. However, the court's Pinkerton instruction required the jury to find that the defendant participated in the conspiracy before it could hold him vicariously liable for the actions of the coconspirators. See R.295, Inst. 52 ("Therefore, if you find a defendant guilty of conspiracy as charged in Count 1 . . . then you should find him guilty of Counts 2, 3, 4, and/or 5." (emphasis added)). "Absent evidence to the contrary, we presume that the jury understood and followed the district court's instructions." United States v. Cornett, 232 F.3d 570, 574 (7th Cir. 2000). Because the jury had no occasion to apply the Pinkerton instruction to Mr. Ford, he was not prejudiced by the instruction. Consequently, we shall not reverse his conviction on this basis.

(b)

Mr. Ford and Mr. Gaughan were convicted of violating the Travel Act, 18 U.S.C. sec. 1952, on or about December 8, 1997. The indictment charged both the principal offense of violating the

Travel Act and aiding and abetting a violation of the Travel Act. "'To establish a violation [of the Travel Act], it is sufficient to show interstate travel or the use of an interstate facility with intent to promote or carry on an unlawful activity, and facts constituting the promotion or carrying on of the unlawful activity.'" United States v. Auerbach, 913 F.2d 407, 410 (7th Cir. 1990) (quoting United States v. Craig, 573 F.2d 455, 489 (7th Cir. 1977)).

Mr. Ford and Mr. Gaughan argue that, because they did not promote or carry on unlawful activity, their Travel Act conviction cannot stand. Mr. Ford and Mr. Gaughan acknowledge that their arguments on the Travel Act count "are, essentially, claims of a derivative nature," Reply Br. at 9; that is, because they were improperly convicted on other counts, they were improperly convicted under the Travel Act. However, we have affirmed Mr. Ford's and Mr. Gaughan's convictions on the other counts that provide a basis for the Travel Act violation. Mr. Ford and Mr. Gaughan do not challenge their conviction on any other basis; accordingly, we affirm their Travel Act conviction.

B.  Sentencing Issues

1.  Mr. Gaughan

Mr. Gaughan challenges the amount of crack attributed to him by the district court. The district court found that Mr. Gaughan had delivered 30 kilograms of cocaine to Bonner and that he should have foreseen that at least 1.5 kilograms of cocaine would have been converted to crack cocaine. Mr. Gaughan argues that he could not have foreseen the amount of cocaine that would have been converted to crack. The district court's determination of the amount of cocaine and crack attributable to Mr. Gaughan is a factual one that we review for clear error. See United States v. Roe, 210 F.3d 741, 748 (7th Cir. 2000); United States v. Burns, 128 F.3d 553, 554 (7th Cir. 1997). We shall reverse the district court's conclusion only if we are left with the firm and definite conviction that a mistake has been made. See United States v. Galbraith, 200 F.3d 1006, 1011 (7th Cir. 2000); United States v. Taylor, 111 F.3d 56, 58 (7th Cir. 1997).

Mr. Gaughan was considered a Category I offender by the district court. On this appeal, he does not challenge the district court's factual finding that 30 kilograms of cocaine may be attributed to him, and the record amply supports this finding. At Mr. Gaughan's sentencing hearing, Bonner testified specifically that he made approximately 30 pickups from Mr. Gaughan,

receiving one kilogram of cocaine each time. According to U.S.S.G. sec. 2D1.1(c), a person convicted of a crime involving between 15 and 50 kilograms of cocaine has a base offense level of 34. However, the district court also found that Mr. Gaughan's crimes involved 1.5 kilograms of crack, which mandates an offense level of 38. The court did not enter detailed findings of fact regarding the percentage of the cocaine converted to crack, stating simply:

The evidence also indicates that Defendant Gaughan knew or reasonably should have foreseen the conversion to crack form, and at a very minimum one and a half kilograms of crack cocaine.

Gaughan Sent. Tr. at 67. We must determine whether the record supports the district court's decision to sentence Mr. Gaughan at a base offense level of 38 rather than 34.

Mr. Gaughan was convicted of conspiring to distribute cocaine. It is appropriate for a district court to attribute to a defendant the conversion of cocaine into crack by the defendant's co-conspirators if that conversion was foreseeable. See United States v. Shorter, 54 F.3d 1248, 1261 (7th Cir. 1995) ("The evidence also indicated that Shorter knew of or reasonably should have foreseen the conversion to crack form.")./16 The record contains evidence indicating that Mr. Gaughan was aware that some cocaine was being converted to crack. Bonner testified at trial that he spoke to Mr. Gaughan about problems Mr. Ford was having with the conversion of cocaine into crack. According to Bonner, Mr. Gaughan responded that his "other peoples" were not having problems with the conversion. Tr. at 311. Later, Bonner was asked, "Did [Mr. Gaughan] know that some of his crack cocaine--some of his cocaine was going to be cooked into crack"; Bonner answered "Yes, he--he knew that." Tr. at 479. From this testimony, the district court could properly conclude that Mr. Gaughan was aware that some cocaine was being converted to crack./17

The burden is on the government to establish the type and amount of drugs attributable to the defendant by a preponderance of the evidence. See United States v. Johnson, 200 F.3d 529, 537 (7th Cir. 2000). It therefore was incumbent upon the Government to establish a conversion ratio. See United States v. Hunter, 145 F.3d 946, 952 (7th Cir. 1998) ("[C]onversion ratios are a finding of fact that must be determined in each individual case."); United States v. Chisholm, 73 F.3d 304, 307-08 (11th Cir. 1996) ("[E]vidence of a conversion ratio must be considered before any

such ratio is applied."). A conversion ratio includes two components. One is the percentage of the powder cocaine that Mr. Gaughan could reasonably foresee would be converted into crack. The other is evidence of the percentage of weight lost during the process of converting cocaine into crack. See Hunter, 145 F.3d at 952; accord Fox, 189 F.3d at 1120.

At times, the Government will be able to provide evidence indicating that all of the powder cocaine in a conspiracy was converted to crack cocaine. See United States v. Taylor, 116 F.3d 269, 273-74 (7th Cir. 1997); United States v. Misher, 99 F.3d 664, 671 (5th Cir. 1996) ("[T]here is evidence from which the court could conclude that Cobb eventually converted all of the powder to crack cocaine."). When the Government cannot prove that all of the cocaine was converted to crack, it must at least provide some evidence of a conversion ratio to support the district court's finding. Furthermore, the district court's determination must be based on reliable evidence, as the Guidelines require, and not on impermissible speculation. See United States v. Howard, 80 F.3d 1194, 1202 (7th Cir. 1996) ("We must be satisfied, however, that the calculation is based on reliable evidence; speculation and unfounded allegations will not do.").

The Government, however, points to no evidence suggesting a conversion ratio. Although the Government has provided evidence that Mr. Gaughan could foresee the conversion of some percentage of the cocaine, it has offered no evidence showing what percentage he expected would be converted. It also has not provided testimony regarding the percentage of cocaine lost in the conversion to crack, which has been relied upon in cases such as this one. See, e.g., Hunter, 145 F.3d at 952. We acknowledge that the district court's estimate of the conversion ratio was conservative. However, because the district court did not discuss the evidence supporting its determination of the conversion ratio, we cannot say that its finding was based on reliable evidence and that it did not "'calculate drug amounts by guesswork'" in contravention of the Guidelines' requirements. United States v. Beler, 20 F.3d 1428, 1433 n.2 (7th Cir. 1994) (quoting United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993)). Consequently, we must remand to the district court for resentencing. We emphasize again that we do not disturb the district court's finding that Mr. Gaughan is responsible for 30 kilograms of cocaine; we vacate the sentence only because the Government has not provided reliable evidence of the conversion ratio foreseeable to Mr. Gaughan.

Finally, Mr. Gaughan submits, by motion filed after oral argument, that the decision of the Supreme Court of the United States in Apprendi v. New Jersey, 530 U.S. 466 (2000) makes his sentence invalid. We cannot accept this argument. According to 21 U.S.C. sec. 841(b)(1)(C), the statutory maximum for an offense involving even a small amount of cocaine is 20 years. See 21 U.S.C. sec. 841 (b)(1)(C). Mr. Gaughan's sentence of 235 months is below that statutory maximum and therefore Apprendi does not apply.

### 2. Mr. Ford

(a)

The district court applied a two-level supervisory enhancement to Mr. Ford's sentence under the Sentencing Guidelines. The Guidelines provide for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. sec. 3B1.1(c). "We have . . . affirmed enhancements under section 3B1.1(c) if the defendant was a key figure who coordinated and organized the criminal activity, even if he did not necessarily control another participant." United States v. Granado, 72 F.3d 1287, 1290 (7th Cir. 1995) (internal quotation marks and citations omitted); see also United States v. Bell, 28 F.3d 615, 617-18 (7th Cir. 1994) (listing factors that distinguish "organizers and leaders" from "rank and file criminals"). The government must prove by a preponderance of the evidence that an enhancement is warranted. See United States v. Cain, 155 F.3d 840, 843 (7th Cir. 1998); United States v. Watson, 189 F.3d 496, 502 (7th Cir. 1999). The district court's decision to enhance a sentence is reviewed for clear error. See Cain, 155 F.3d at 843.

In this case, the record supports a finding that Mr. Ford coordinated Mr. Stott's activities. Bonner testified that Mr. Ford introduced Mr. Stott to him and that Mr. Ford told Bonner that Mr. Stott would be meeting him to pick up drugs:

Q. And how did you happen to meet Larry [Stott]. What were the circumstances of that meeting, sir?
A. The circumstances of that meeting was he would probably be meeting to purchase further drugs.
Q. That is Lonnie Ford?
A. Yeah, Lonnie brought him with him.
Q. And he introduced you to Larry?
A. Yes, he did.
Q. What did he tell you about Larry?
A. This was his guy.
Q. What else did he tell you?
A. That he would probably be coming back and

forth to pick up the drugs.

. . . .

Q.  Approximately how many times did either Larry or Lonnie come to your house?

A.  About four times.

Q.  And each time it was for what purpose, sir?

A.  It was to pick up drugs.

Tr. at 301-02.

Bonner did offer potentially inconsistent testimony on the subject of whether Mr. Stott was merely a courier for Mr. Ford or, instead, a customer in his own right. At trial, Bonner testified that Mr. Stott was not a customer of his, leaving an inference that Mr. Stott was Mr. Ford's courier. At Mr. Gaughan's sentencing hearing, however, when Bonner was asked who his customers were, he answered "Lonnie Ford, Larry Stott." Gaughan Sent. Tr. at 29. This, suggests Mr. Ford, shows that Mr. Stott was a customer in his own right. We do not necessarily view the testimony as inconsistent; Mr. Stott could have both transported cocaine on behalf of Mr. Ford and purchased cocaine from Bonner for his own use. Because there is evidence in the record that Mr. Ford coordinated Mr. Stott's activities for some part of the conspiracy, we cannot say the district court's decision was clearly erroneous.

(b)

Mr. Ford also challenges the district court's drug quantity calculation. The district court attributed to Mr. Ford 1.5 kilograms of crack cocaine. That amount of crack mandates an offense level of 38 pursuant to U.S.S.G. sec. 2D1.1(c). With the supervisory enhancement, Mr. Ford's total offense level was 40. The Guidelines mandate that a category V offender, such as Mr. Ford, with an offense level of 40 be given a sentence between 360 months and life imprisonment; the district court sentenced Mr. Ford to 360 months and then added a consecutive 60-month sentence for his sec. 924(c)(1) conviction./18 On appeal, Mr. Ford challenges only the district court's drug quantity calculation. Again, we review for clear error, and we shall reverse only if we are left with the firm and definite conviction that a mistake has been made. See Galbraith, 200 F.3d at 1011.

The district court did not enter any specific findings about the cocaine quantity attributable to Mr. Ford. At Mr. Ford's sentencing hearing, it stated:

The Court does find by a preponderance of the evidence that the cocaine that is attributable to this Defendant was in fact cocaine base and for

purposes of this particular case, crack cocaine.

> And that the amount of crack cocaine attributable and foreseeable to this Defendant was at least one and a half kilograms and more likely than not a great deal more.

> But at least 1.5 kilograms.

Ford Sentencing Transcript ("Ford Sent. Tr.") at 25. The Government makes two arguments to support its contention that Mr. Ford is responsible for over 1.5 kilograms of crack. The first is that Mr. Ford converted to crack much of the cocaine powder provided to him by Bonner. The second is that Bonner provided to Mr. Ford cocaine that was already in crack form. We consider these contentions in turn.

First, Bonner offered testimony that supports a finding that Mr. Ford converted to crack some of the cocaine that Bonner provided to him. Bonner testified that in 1997, approximately from April to October, he provided cocaine to Mr. Ford. In October, Bonner stated, Mr. Ford complained about losing too much cocaine during the process of converting it to crack. From that testimony, it may be inferred that Mr. Ford converted some cocaine to crack between April and October. However, there is no reliable evidence indicating the amount of cocaine converted to crack by Mr. Ford. At Mr. Gaughan's sentencing hearing, Bonner acknowledged that he never saw Mr. Ford cook cocaine into crack, that he did not know how Mr. Ford cooked the cocaine and that he did not know what amount of cocaine Mr. Ford was converting to crack. The Government identifies no other evidence that shows how much of the cocaine Mr. Ford received from Bonner between April and October was converted to crack. Although the evidence indicates that Mr. Ford converted to crack some of the cocaine he received from Bonner, the Government was also obligated to provide evidence of a conversion ratio. See Hunter, 145 F.3d at 952. The Government's failure to provide evidence of a conversion ratio precludes us from attributing to Mr. Ford any specific amount of crack he cooked from cocaine delivered by Bonner between April and October.

Turning to the Government's second contention, Bonner also testified that, after his October conversation with Mr. Ford, he began to cook cocaine into crack on his own before delivering it./19 This testimony provides a more reliable basis for determining the amount of crack attributable to Mr. Ford. Bonner testified that, in October, he delivered to Mr. Ford approximately 500 grams of cocaine and that approximately 75% to 80% of that amount--or 375 to 400 grams--was in crack form. Bonner testified

further that in the last meeting he had with Mr. Ford prior to being arrested, he had with him 250 grams of cocaine, of which "over half"--or more than 125 grams-- was crack. Gaughan Sent. Tr. at 37.[20] Finally, at the time Bonner was arrested, he had in his possession 403 grams of crack that he planned to deliver to Mr. Ford.[21] Adding together these amounts, the total amount of crack attributable to Mr. Ford from Bonner's testimony is at least 903 grams. Thus, there is at least some evidentiary basis for a finding that Mr. Ford's criminal activities involved 903 grams of crack.

We are concerned that neither the Government nor the district court identified any other portion of the record in which specific evidence is offered to establish the amount of cocaine attributable to Mr. Ford. The district court may have engaged in impermissible speculation when it relied on Bonner's testimony to attribute to Mr. Ford 1.5 kilograms of crack. However, for the reasons set forth below, we are convinced that any error committed by the district court in Mr. Ford's case was harmless.

According to the Sentencing Guidelines, the appropriate base offense level for offenses involving at least 500 grams of crack, but less than 1.5 kilograms, is 36. Combined with his supervisory enhancement, this would give Mr. Ford a total offense level of 38, rather than the total offense level of 40 determined by the district court. However, for a category V offender, the difference between the base offense levels of 38 and 40 is irrelevant: Both offense levels warrant a sentence of 360 months to life. Mr. Ford was sentenced to 360 months, the minimum for either offense level.

We believe that the best course on these facts is to hold that any error by the district court is harmless. We have stated

that where two Guidelines ranges overlap and the sentence imposed would have been the same regardless of which range was applied, the technical dispute over which range to apply may be left unresolved. As long as it is reasonable to conclude that the same sentence would have been imposed regardless of the outcome of the dispute over which range to apply, we need not resolve the dispute.

Frazier, 213 F.3d at 418 (internal citations omitted); see also United States v. Howard, 179 F.3d 539, 545 (7th Cir. 1999). Here, although the district court may have used the wrong offense level, it used the correct sentencing range. Further, it applied the minimum sentence. Thus,

we have confidence that, had the district court sentenced Mr. Ford using the correct offense level, it would have given him the same sentence. Moreover, because 360 months is the minimum Guidelines sentence for a category V offender who commits an offense with a total offense level of 38, Mr. Ford would have nothing to gain by being resentenced based on an attribution of 903 grams of crack. Consequently, we affirm his sentence.

(c)

Finally, Mr. Ford submits, by motion filed after oral argument, that Apprendi renders his sentence invalid. As we have pointed out earlier, the statutory maximum for an offense involving cocaine is 20 years. That maximum increases to 30 years, however, if the offense is committed by a person with a prior conviction for a felony drug offense. Mr. Ford has such a conviction. Thus, the statutory maximum for his current offense is 30 years, the sentence he actually received. Accordingly, Apprendi does not apply.

Conclusion

For the reasons set forth above, we affirm the three defendants' convictions. Mr. Ford's sentence is also affirmed. Mr. Gaughan's sentence is vacated, and his case is remanded for resentencing in conformity with this opinion.

AFFIRMED in part, VACATED and REMANDED in part

/1 Agent King's testimony before the grand jury and at trial differed on these events. The discrepancies in his testimony are discussed in Part II.A.2., infra.

/2 The indictment charged the defendants with the following crimes:

Count I:  (All defendants) Conspiracy to possess with intent to deliver more than five kilograms of cocaine, and to possess with intent to distribute and distribute more than 50 grams of cocaine base, Summer 1997-December 15, 1997, in violation of 21 U.S.C. sec.sec. 841(a)(1) and 846, and 18 U.S.C. sec. 2

Count II:  (All defendants) Possession with intent to distribute more than 50 grams of cocaine base, December 8, 1997, in violation of 21 U.S.C. sec. 841(a)(1) and 18 U.S.C. sec. 2

Count III: (All defendants) Possession with intent to distribute cocaine, December 8, 1997,

in violation of 21 U.S.C. sec. 841(a)(1) and 18 U.S.C. sec. 2

Count IV: (All defendants) Interstate travel in aid of unlawful activity involving possession with intent to distribute cocaine, December 8, 1997, in violation of 18 U.S.C. sec.sec. 1952 and 2

Count V: (Ford, Gaughan, Stott, Kulikowski) Carrying a firearm during and in relation to a conspiracy to possess with intent to distribute cocaine and cocaine base, December 9, 1997, in violation of 18 U.S.C. sec.sec. 924(c)(1) and 2

Count VI: (Gaughan, Kulikowski) Interstate travel in aid of an unlawful activity involving the possession with intent to distribute cocaine, December 15, 1997, in violation of 18 U.S.C. sec.sec. 1952 and 2

Count VII: (Gaughan, Kulikowski) Carrying a firearm during and in relation to a conspiracy to possess with intent to distribute cocaine, December 15, 1997, in violation of 18 U.S.C. sec.sec. 924(c)(1) and 2

/3 The case against Kulikowski also went to trial. At the close of the Government's case against her, she moved for acquittal on all charges, and the district court granted the motion.

/4 Mr. Gaughan had moved prior to trial to suppress his statement on the ground that it was the product of coercion by the interviewing officers who had refused to provide him necessary medical attention. After a suppression hearing, however, the district court denied the motion.

/5 For that conviction, Mr. Stott received a sentence of 60 months, the statutory maximum for his offense.

/6 18 U.S.C. sec. 1952 provides in relevant part:

(a) Whoever travels in interstate or foreign commerce or uses the mail of any facility in interstate or foreign commerce, with intent to--
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform--

    (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both . . . .

/7 Mr. Gaughan, in his motion to suppress, also forwarded other grounds to suppress his statements. These bases, however, were abandoned during the suppression hearing.

/8 Mr. Gaughan does not take issue with the plain error standard in his reply brief.

/9 In an unpublished opinion, a panel of the Tenth Circuit followed the same course. See United States v. Johnson, No. 96-2008, 1997 WL 381926 (10th Cir. July 7, 1997). In that case, the panel decided that the evidence was not material, meaning there could be no Brady violation even if Brady did apply to suppression hearings. See id. at *3.

/10 One of these two counts charged possession with the intent to distribute more than 50 grams of cocaine base. The other count charged possession with the intent to distribute cocaine.

/11 The district court gave several instructions concerning when one defendant may be liable for the actions of other defendants. Among those instructions was Court's Instruction No. 56, which states: "Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime. However, that person must knowingly associate himself with the criminal venture, participate in it, and try to make it succeed." R.295, Inst. 56.

/12 It is important to note that Mr. Ford's challenge addresses only the "in relation to" prong of sec. 924(c)(1), not the "uses or carries" prong. Speaking to the "use" prong, the Supreme Court has held that the "inert presence" or "storage" of "a firearm, without more, is not enough to trigger sec. 924(c)(1)." Bailey v. United States, 516 U.S. 137, 149 (1995). Accordingly, we have reversed convictions where the record did not convince us that the defendant used a firearm as defined in Bailey. See, e.g., United States v. Stanback, 113 F.3d 651, 654-57 (7th Cir. 1997) (holding that a gun resting on a table where drugs were present was not "used"); United States v. Holmes, 93 F.3d 289, 293-96 (7th Cir. 1996) (reversing conviction when jury might have relied on evidence that did not show actual use). Here, however, Mr. Ford does not challenge the jury's finding that he "used" or "carried" the gun, only that his use was not "in relation to" his drug

crimes.

/13 At trial, counsel for Mr. Gaughan objected to the propriety of any instruction based on Pinkerton liability, stating, "And just Pinkerton generally that shouldn't apply. We just have a general objection." Tr. at 715. The district court overruled that objection. Mr. Gaughan's counsel raised a further complaint about having a Pinkerton instruction, see id. 736-37, but the district court again stated that it would give the instruction. At neither time did Mr. Gaughan's counsel raise any objection to the form of the instruction. In this court, Mr. Ford and Mr. Gaughan do not argue that a Pinkerton instruction was inappropriate.

/14 We are not willing to state that the instruction is, as a matter of law, deficient. There may be circumstances where, in combination with other instructions, an instruction such as this one may be adequate. However, such circumstances are not present here.

/15 There does not seem to be any dispute, however, that Mr. Gaughan knew that Bonner was transporting cocaine across state lines using interstate highways.

/16 Other circuits have agreed that, when a defendant could foresee the conversion of cocaine to crack, he properly may be held accountable for the conversion. See United States v. Fox, 189 F.3d 1115, 1119 (9th Cir. 1999) (collecting cases), cert. denied, 528 U.S. 1098 (2000).

\17 Mr. Gaughan claims that Bonner later contradicted himself by testifying that Mr. Gaughan was unaware that cocaine was being converted to crack. We cannot accept this interpretation of the record. Bonner's later testimony indicates only that Mr. Gaughan was not aware that it was Bonner personally who was converting cocaine into crack:

Q. So, that that person who was supplying you with the powder didn't know that you yourself were making it into crack, right?
A. No.
Q. And is that--you agree with me?
A. Yes.
Q. That the person who was supplying you with the powder did not know that you were making it into crack?
A. No, he didn't know what I was doing.

Tr. at 409-10. Bonner later clarified that Mr. Gaughan did not know that Bonner personally was converting cocaine into crack but that Mr. Gaughan was aware that someone was converting

cocaine into crack:

Q.  You were asked the question whether or not
Bob [Gaughan] knew that you were cooking crack
cocaine, and you said you--he didn't, is that
correct?
A.  Correct.
Q.  Did he know that some of his crack cocaine--
some of his cocaine was going to be cooked into
crack?
A.  Yes, he--he knew that.
Tr. at 479. None of the testimony identified by
Mr. Gaughan contradicts Bonner's statements that
Mr. Gaughan was aware that some cocaine was being
converted into crack but was unaware that it was
Bonner personally who was undertaking the
conversion.

/18 18 U.S.C. sec. 924(c)(1) requires that all
defendants convicted of using or carrying a gun
in relation to a drug trafficking offense serve a
60-month sentence consecutive to their sentence
for the underlying drug trafficking offense.


/19 Specifically, Bonner offered the following
testimony:

Q.  [D]id you take any other action in terms of
this problem with the crack cocaine?
A.  Yes, I did.
Q.  What did you do?
A.  I started cooking it myself.
Q.  And once you cooked it, what did you do with
it?
A.  Then I would get it to my--Larry.
Q.  Before that, you were basically just giving
them powder?
A.  Yes.
Q.  And now you're giving them crack cocaine?
A.  Yes.

Tr. at 311.

/20 Bonner testified that in the meeting previous to
that one he brought less than 250 grams; however,
he did not state the smallest amount he might
have brought. Bonner also could not state with
any certainty the number of other deliveries he
made to Mr. Ford.

/21 The police officer who arrested Bonner testified
that he found a bag of crack cocaine in Bonner's
car. The defense stipulated that the amount found
in the bag was 403.7 grams.